FOR PUBLICATION

**FILED**
JAMES J. WALDRON, CLERK
**November 2, 2015**
U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY: s/ Juan Filgueiras, DEPUTY

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re:<br><br>PETERSBURG REGENCY LLC,<br><br>                Debtor. | Case No.:    15-17169 VFP<br><br>Judge:     Vincent F. Papalia, U.S.B.J.<br><br>Chapter 11 |

## OPINION

**APPEARANCES:**

Sokol Behot, LLP
David Edelberg, Esq.
433 Hackensack Avenue
Hackensack, NJ 07601
*Counsel for Debtor*

Eckert Seamans Cherin & Mellott LLC
Warren L. Soffian, Esq.
50 South 16 Street, 22nd Floor
Philadelphia, PA 19102
*Counsel for WCD Consultants*

Forman Holt Eliades & Youngman LLC
Daniel M. Eliades, Esq.
David S. Catuogno, Esq.
80 Route 4 East, Ste. 290
Paramus, NJ 07652
*Counsel for Ramada Worldwide Inc.*

Accardi & Mirda
Anthony J. Accardi, Esq.
100 Eaglerock Avenue, Ste. 307
East Hanover, NJ 07936
*Pro Se*

Steve M. Kalebic, Esq.
167 Main Street
Hackensack, NJ 07601
*Pro Se*

Newman & Denburg, LLC
Gary S. Newman, Esq.
22-01 Broadway
Fair Lawn, NJ 07410
*Counsel for AH Realty Associates, LLC*

Drinker Biddle & Reath LLP
Robert K. Malone, Esq.
600 Campus Drive
Florham Park, NJ  07932
***Counsel for Selective Way Insurance Co.***

Porzio Bromberg & Newman
Warren J. Martin, Esq.
Rachel A. Parisi, Esq.
100 Southgate Parkway
P.O. Box 1997
Morristown, NJ  07962
***Counsel for James Burt***
Joseph H. Neiman, Esq.
85 Main Street
Hackensack, NJ  07601
***Counsel for William Spier***

Nathalie I. Johnson-Noon, Esq.
401 East Jefferson Street, Ste. 204
Rockville, MD  20850
***Counsel to ThyssenKrupp Elevator Corp.***

Honorable Anthony J. Sciuto
Maggiano DiGirolamo & Lizzi PC
201 Columbia Avenue
Fort Lee, NJ  07024
***Pro Se***

Mitchell B. Hausman, Esq.
Office of the United States Trustee
One Newark Center
1085 Raymond Boulevard, Ste. 2100
Newark, NJ  07102

Eamonn O'Hagen, Esq.
Asst. United States Attorney
United States Attorney's Office
970 Broad Street, Ste. 700
Newark, NJ  07102
***Counsel to United States of America***

Perkins Coie LLP
Gary F. Eisenberg
30 Rockefeller Plaza, 22nd Fl.
New York, NY  10112
***Counsel for Ittleson Trust-2010-1***

Delbello Donnellan Weingarten
Wise & Wiederkehr, LLP
Jonathan S. Pasternak, Esq.
One North Lexington Avenue
White Plains, NY  10601
***Counsel for R. Oshinsky & Co.***

Webber McGill LLC
Douglas J. McGill, Esq.
760 Route 10, Ste. 104
Whippany, NJ  07981
***Counsel for LeClairRyan***

Cole Schotz Meisel Forman & Leonard, PA
Kenneth L. Baum, Esq.
25 Main Street-Court Plaza North
Hackensack, NJ  07601
***Counsel for A.H. Realty Associates***

Spencer Shuford LLP
Mark C. Shuford, Esq.
6806 Paragon Place, Ste. 200
Richmond, VA  23230
***Counsel for City of Petersburg***

Mr. Frank Conner
Air Technology Inc.
31 Glenbourne Drive
Boonton, NJ  07005

**HONORABLE VINCENT F. PAPALIA, Bankruptcy Judge**

## I.    INTRODUCTION

These matters come before the Court on multiple contested motions filed by certain creditors of Petersburg Regency, LLC, a Chapter 11 Debtor (the "Debtor"), and one by the Debtor. The Debtor is a nonoperating hotel formerly located in Virginia and irretrievably damaged by a hurricane in 2003.  The issue for the Court is whether to grant the creditors' motions to approve a settlement among them that provides for the distribution of the Debtor's only significant asset, the insurance proceeds generated by the storm damage, under a consensual settlement among those creditors (the "Settling Creditors") and thereafter dismiss the case.  In opposition, the Debtor, as joined by its principals, Mr. and Mrs. Harmon (the "Harmons"), argues (among other things) that the settlement and dismissal should not be approved as it is not in the best interests of creditors and that the Debtor should instead be permitted to proceed with a different distribution scheme under a Chapter 11 plan of liquidation. The Settling Creditors, who represent *all* the remaining secured and unsecured, non-insider claims against the Debtor, have advised that they unanimously oppose the Debtor's proposed Plan.

The Creditors' motions are:

(1) Motion of LeClairRyan, P.C. ("LeClair") to dismiss the bankruptcy case under 11 U.S.C. § 1112(b) (Dkt. No. 26) (the "Motion to Dismiss").

(2) Amended Cross-Motion of Jim Burt ("Burt") for entry of an Order directing disbursement of Insurance Proceeds in connection with the dismissal of case (Dkt. No. 56 amending Dkt. No. 40) (the "Structured Dismissal Motion" and, with the Motion to Dismiss, the "Dismissal Motions").

(3) Motion of Burt to approve a settlement among the Settling Creditors and dismiss the Debtor's bankruptcy case (Dkt. No. 110) (the "Settlement Motion").

(4) Motion of Burt to expunge the claim of Specialized Environmental Services dba ATI Air Technology, Inc. (Dkt. No. 65).

1

The Debtor's application is a motion to expunge, reduce or modify certain claims (the "Claims Motion") (Dkt. No. 106)    Both Burt's Motion to Expunge and the Claims Motion by Debtor are addressed and resolved in separate orders.  (Dkt. Nos.154 and 155).

For the reasons set forth below, the Court will approve the settlement among the Settling Creditors, authorize the distribution of the insurance proceeds pursuant to that settlement, and dismiss the bankruptcy case.

## II.    JURISDICTIONAL STATEMENT

The Court has jurisdiction over these matters under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court on July 10, 1984 and amended on October 17, 2013.  These are core proceedings under 28 U.S.C. § 157(b)(2)(A), (B), (K)[1] and (O). Venue is proper in this court under 28 U.S.C. § 1408.  The Court issues the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.  To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## III.    PROCEDURAL AND FACTUAL HISTORY[2]

### A.    The Insurance Litigation

On September 13, 2003, the Debtor's hotel property in Petersburg, Virginia (the "Property"), sustained serious hurricane damage (Dkt. No. 110-1, ¶ 3).  On September 20, 2004, the Debtor filed an action against its carrier, Selective Way Insurance Co. ("Selective") in the

---

[1] 28 U.S.C. § 157(b)(2)(K) is "determination of the validity, extent, or priority of liens."  On June 14, 2015, the Debtor filed Adversary Proceeding No. 15-1995 (VFP) against Selective Way Insurance Co., many of the Settling Creditors and the Clerk of the Circuit Court for the City of Petersburg, Virginia, for turnover of the insurance proceeds, a determination of the validity, priority and extent of liens and for other relief (the "Adversary Proceeding").  The Court extended the due date for responsive pleadings to the adversary complaint to a date that is two weeks after the Court's decision on the pending Motions, unless the Motion to Dismiss and Approve the Settlement are granted.  Because those Motions are being granted, there is no need to answer the adversary complaint, which will be dismissed.

[2] This chronology is generally taken from Burt's Structured Dismissal Motion (Dkt. No. 110-1), unless otherwise indicated.

Superior Court of New Jersey, Law Division, Bergen County, entitled *Petersburg Regency, LLC*

*v. Selective Way Insurance Company*, Dkt. No. BER-L-12179-04 (the "Bergen County Action" or

the "Insurance Litigation") to recover on its policy (Dkt. No. 110-1, ¶ 4).  The Debtor ceased

operations in 2011 and ultimately lost the Property to a tax sale foreclosure in 2014 (Dkt. No. 26-1,

McGill Appl., ¶¶ 5, 7 and Dkt. No. 26-2, McGill Cert., Ex. B).

        After ten years of litigation in two states, including appeals and a reversal on appeal, the

action was ultimately referred to arbitration.  On December 23, 2014, Judge Anthony J. Sciuto

(ret.), arbitrator, issued an opinion awarding the Debtor damages of $9,697,423 plus interest

against Selective (Dkt. No. 110-1, ¶ 5).  By Arbitration Award dated December 30, 2014, the

amount of the interest was liquidated, with the result that the total award was $10,230,626.64 (the

"Arbitration Award") (Dkt. No. 110-1 ¶ 6).

## B.  The  Interpleader Action and the Virginia Involuntary Bankruptcy Case and Other Related Litigation

        As part of the extensive procedural maneuverings in this case, on December 30, 2014, the

same day the final Arbitration Award was issued, Selective filed an Interpleader Action (the

"Interpleader Action") in the Circuit Court of the City of Petersburg, Virginia (Case No. CL

14-848).  The Interpleader Action named the Debtor and several of its secured creditors, including

Burt, Ittleson, Steve Kalebic and Accardi & Mirda, as defendants.  (Dkt. 26-2, McGill Cert., Ex.

D).  In connection with that Action, Selective deposited $10,230,626.64, which represented the

entire Arbitration Award, with the Petersburg Clerk of Court.

        On January 7, 2015, the Debtor made application in the New Jersey Action for entry of an

Order to Show Cause with Temporary Restraints seeking, among other things, an order: (i)

temporarily and permanently enjoining Selective from pursuing the Interpleader Action; (ii)

confirming the Arbitration Award; and (iii) enjoining Selective from contacting and

communicating with the Debtor's creditors.

3

Not to be undone, on February 3, 2015, three alleged unsecured creditors of the Debtor filed an involuntary Chapter 7 petition (the "Involuntary Case") against the Debtor in the United States Bankruptcy Court for the Eastern District of Virginia (Case No. 15-30526), which temporarily stayed both the New Jersey Action and the Interpleader Action.[3]  The three petitioning creditors were experts utilized by LeClair in the New Jersey Action.  As is acknowledged by LeClair and as is also noted by the Debtor, the claims of these creditors are included in the $901,839.08 amount claimed to be owed to LeClair.  *See* Response of LeClair to Claims Motion (Dkt. No. 128, ¶ 4).[4]

On February 25, 2015, the Debtor filed a motion to dismiss the Involuntary Case and a Memorandum in Support.  In that Memorandum, the Debtor argued forcefully that the Involuntary Case should be dismissed for various reasons, including particularly that the bankruptcy filing was "futile" as the estate's "lone asset has insufficient value to ever result in a penny payout" to the Petitioning Creditors (who are unsecured) (Dkt. No. 26-2, McGill Cert., Ex. F, Memorandum in Support of Motion to Dismiss, pp. 1-2).  Additionally, the Debtor argued that:

- The Involuntary Petition was filed in bad faith and for an improper purpose. (p.13).

- The amounts asserted as being secured against the Arbitration Award "far exceed" the amount of the Arbitration Award (of $10,225,583.92).  *Id*. at 13-14.

- The pleadings filed in the state courts show that a Chapter 7 proceeding would be futile, in that the amount of claims asserted by prepetition secured creditors is in excess of the total amount of assets available for distribution.  *Id.* at 14.

- [E]ven if an order for relief [in a Chapter 7 case] was entered, a Chapter 7 Trustee would likely conclude that there was [sic] no assets available for distribution to unsecured creditors and he or she would abandon his interest in the arbitration award and file a "no asset report."  *Id.*

---

[3] The Debtor has alleged that the Involuntary Case was "orchestrated" by LeClair, which served as counsel to the Debtor in the New Jersey Action.  This Court is not ruling on the Debtor's claims relating to the Involuntary Case, as they are not relevant to the resolution of the pending motions and are preserved to the Debtor in any event, as are the defenses of LeClair and any other allegedly involved parties.

[4] LeClair's total proof of claim of $901,839.08 is broken down into $816,186.08 for attorneys' fees and $85,653 for expert fees and expenses, including the petitioning creditors.  *Id.* at ¶ 4.

- To ask this Bankruptcy Court to be added to the mix creates no added value to the process and only wastes this Court's valuable time and resources.  *Id.* at 16.

- The bankruptcy process in this instance may have a counterproductive result in that the time and costs associated with the liquidation process may be assessed against the precious available funds prior to any future creditor distribution, which may not be realized until a very long time in the future.  *Id.* at 16.

- *There is no legitimate purpose behind the bankruptcy case when reviewing the facts even in a light most favorable to the Petitioning Creditors*.  The Arbitration Award is $10,225,583.92.  The amounts asserted as being secured against the Arbitration Award far exceed the amount of the Arbitration Award.  *Id.* at 13 and see chart prepared by Debtor's counsel, which lists the secured claims and their amounts.  *Id.* at 13, n.4 (emphasis supplied).

- After stating that Mr. Burt's claim was $8.4 million, but may be disputed (by other parties), the Debtor further indicates that "no party maintains that the amounts actually loaned [by Mr. Burt] were less than $3,177,000" and concluded as follows:

  > Accordingly, even if the amounts that are owed [to Mr. Burt] is [sic] ultimately determined to be less than asserted, total amounts owed to all secured creditors still exceed the amount of the Arbitration Award.  *Id*. at 13, n.4.

- On p.13 at footnote 4, the Debtor further states (twice) that:  "there would be no remedies solely based on bankruptcy law to pursue in this Court."

Finally, in opposing the Involuntary Petition, the Debtor concludes that:

> *A reasonable person who is aware of all the facts would never have filed the Involuntary Petition, and the only reason it was filed was for an improper purpose.  Id*. at 15 (emphasis supplied).

Shortly after the motion to dismiss was filed, the Petitioning Creditors agreed to voluntarily withdraw the Involuntary Case pursuant to the terms of a Consent Order entered on March 18, 2015 and a related Settlement Agreement among the involved parties.  (Dkt. 46-1, Supp. McGill Cert., Ex. A).

In filing this voluntary petition, the Debtor has taken directly contrary or inconsistent positions, including that:

5

- The filing is in good faith and for numerous proper purposes.  Debtor's opposition to LeClair Motion to Dismiss (Dkt. No. 39) at p.8.

- The liens and claims of the secured creditors may be challenged such that the secured claims are less than the Arbitration Award.  *Id.  See also* Adversary Complaint and July 2015 Harmon Certification challenging amount due Burt and Ittleson, among others.

- Ittleson is owed only $2 million, rather than the $7.2 million presented to the Virginia Bankruptcy Court, *id.* at 13; Harmon's Brief in Opposition to Motion to Approve Settlement (Dkt. No. 124) at 23 (Ittleson is entitled to the first $2 million of the Award, no more).

- The Chapter 11 (or 7) process that included challenges to the various liens and claims of creditors *would* benefit the estate and creditors.  Debtor's Brief (Dkt. No. 75) at 36-37.  In other words, the secured claims do *not* exceed the Arbitration Award, there *are* various bankruptcy law remedies to pursue in this Court, and there *would* be a recovery to unsecured creditors in a bankruptcy case.

- The Harmons are owed $9.4 - $12 million and entitled to share in the Arbitration Award as unsecured creditors. *See, e.g.,* Harmon Brief at 2-3 (Dkt. No. 124).

When confronted with these conflicting or inconsistent positions, the Debtor's response is that they were statements of counsel, not of the Debtor.  However, the factual information utilized by Debtor's counsel in filing the motion to dismiss was not based on counsel's knowledge.  That information had to be obtained from the Debtor through its agents.  Further, there is no allegation by the Debtor that the information contained in the motion to dismiss is inaccurate or was not authorized to be represented to the Court by Debtor's Virginia counsel.   The Debtor cannot "walk away" from the factual representations it made in another court - - through counsel or otherwise - - and take inconsistent or contradictory positions in this Court.

### C.  The Distribution Motion in the Interpleader Action

Shortly after the dismissal of the Involuntary Case, certain creditors in the Virginia Interpleader Action moved for entry of an order providing for distribution of the Interpleader Funds to eight named creditors (the "Distribution Motion").  Those creditors and the amount of their proposed distributions are set forth below in Section D (iii).  Although the Distribution

Motion was not returnable until April 23, 2015, the Virginia Court entered an Order on April 15, 2015 granting the requested relief (Dkt. No. 75, Debtor's Mem. p.17).

### D.  This Chapter 11 Case

### (i)  The Chapter 11 Filing and the Motions to Dismiss and Approve the Settlement

The Debtor filed the instant Chapter 11 petition on April 20, 2015 and immediately thereafter notified the Virginia State Court.[5]  On April 21, 2015, the day after the Debtor filed this case, the Virginia Court entered an Order vacating the Distribution Order, without explanation (Dkt. No. 110-1, ¶¶ 12-13).  LeClairRyan filed the Motion to Dismiss this case under 11 U.S.C. § 1112(b) on May 21, 2015 (Dkt. No. 26), and additional applications followed.

On June 16, 2015, Burt initially filed a Cross-Motion Directing Disbursement of Insurance Proceeds in connection with Order Dismissing Case (Dkt. No. 40) and on June 30, 2015, subsequently amended that Cross-Motion based on agreements with additional Settling Creditors (Dkt. No 56) (as amended, the "Structured Dismissal Motion").  Burt filed the instant Motion to Approve the Settlement (the "Settlement Motion") on August 19, 2015.

### (ii)    The Structured Dismissal and Settlement Motions

By the Structured Dismissal and Settlement Motions, Mr. Burt asks this Court to: (i) Approve a Settlement Agreement (the "Settlement Agreement" or the "Settlement") among *all* the Debtor's remaining creditors (the "Settling Creditors") -- except for Mr. and Mrs. Harmon, who are insiders -- which provides for the distribution of the Arbitration Award among the Settling Creditors in agreed-upon amounts, subject to a $150,000 "carve out" for administrative claimants;

---

[5] According to the petition, Robert Harmon ("Harmon"), managing member, owns one percent (1%) of the Debtor, and Marlene Harmon, Mr. Harmon's wife, owns the remaining ninety-nine percent (99%) (Dkt. No. 1, ¶ 21a).  Harmon signed the petition and corporate resolution as "managing member" (Dkt. No. 1, p. 3; Dkt. No. 11).  According to the Debtor's schedules, its only asset is the Arbitration Award, although Mr. Harmon made reference to some unspecified tax loss carryforwards in his testimony.

(ii) dismiss this bankruptcy case; and (iii) retain jurisdiction for the limited purposes of awarding administrative expenses and enforcing and interpreting the terms of its related orders.

All the Settling Creditors support the Structured Dismissal and Settlement Motions. The only opposition to both the Structured Dismissal and Settlement Motions was by the Debtor and the Harmons. The United States Trustee submitted limited opposition to the Structured Dismissal Motion, but took no position with respect to the Settlement Motion. Additionally, all the Settling Creditors have indicated that they unequivocally oppose the proposed Plan filed by the Debtor, particularly because it provides for unacceptable treatment of their claims and a distribution to the Harmons. The Settling Creditors further advised that they would not agree to allow any Chapter 7 Trustee to utilize their collateral -- i.e., the Arbitration Award -- to fund a Chapter 7 case.

As is demonstrated in the chart in Section D (iii) below, the scope of the Settlement has been steadily expanded during the course of these proceedings such that all the Debtor's remaining creditors -- except the Harmons -- are now participating in the Settlement. The IRS, which had objected to the original Structured Dismissal Motion on the ground that its priority claim was not addressed, has now joined in the Settlement and is receiving distributions on its secured and priority claims. Additionally, the Settling Creditors agreed to "carve out" $150,000 from the Arbitration Award to pay the claims of administrative claimants (including Debtor's counsel and the U.S. Trustee), subject to the filing of appropriate fee applications and awards.

**(iii)    <u>Treatment of Creditors in Burt's Dismissal and Settlement Motions</u>**

As is demonstrated from the summary below, the steady alignment of the Settling Creditors into consensus over the course of four litigations and this bankruptcy case provides strong support for the approval of the Settlement. In the Virginia Interpleader Action, the short-lived Distribution Order of April 15, 2015 distributed the Arbitration Award primarily to secured creditors as follows:

8

| Creditor | Amount | Status |
|---|---|---|
| Ittleson | $4,092,610.00 | Secured |
| Burt | 4,392,610.00 | Secured |
| LeClairRyan (Advanced/WCD/Keiter) | 816,186.00 +85,653.00 | Secured (Attorney's Lien) |
| Accardi & Mirda | 159,566.00 | Secured (Attorney's Lien) |
| Kalebic | 300,000.00 | Secured (Attorney's Lien) |
| Ramada | 100,000.00 | Secured (Judgment Lien) |
| City of Petersburg | 250,000.00 | Unsecured |
| Hon. Anthony Sciuto | 34,000.00 | Unsecured |

(Dkt. 110-1, ¶ 10).  Excluded from this distribution (referred to by the Debtor as the "Shut Out Creditors") were:

| Creditor | Amount | Status |
|---|---|---|
| IRS | $    73,782.00 | Secured (Statutory Lien |
| IRS | 142,994.00 | Priority |
| A.H. Realty | 360,000.00 | Secured (Judgment Lien) |
| Oshinsky | 948,063.00 | Secured (Equitable Lien) |
| ThyssenKrupp | 52,540.00 | Secured (Judgment Lien) |
| Specialized Environmental | 125,000.00 | Unsecured |
| Spier | 325,000.00 | Unsecured |
| The Harmons | 9,400,000.00 to 12,000,000.00 | Unsecured/Insider |

By the time Burt filed his amended Structured Dismissal Motion, four of the previously "Shut Out Creditors" -- AH Realty, Oshinsky, ThyssenKrupp and the IRS secured claim -- were included in the proposed distribution (Dkt. No. 56, Ex. A). Thus, at that time, only the following creditors were excluded:

| Creditor | Amount | Status |
|---|---|---|
| IRS | $    142,994.00 | Priority |
| Specialized Environmental | 125,000.00 | Unsecured |
| Spier | 325,000.00 | Unsecured |
| The Harmons | 9,400,000.00 to 12,000,000.00 | Unsecured/Insider |

Burt proposed in the amended Structured Dismissal Motion that the claim of Specialized Environmental be expunged on its merits (Dkt. No. 56, ¶¶ 58-64) and filed a separate motion seeking that relief (Dkt. No. 65).

By the time the Settlement Motion was filed on August 19, 2015, Burt had obtained consent to the proposed distribution from *every creditor* (including the IRS and Spier), except:   (1) Specialized Environmental; and (2) the Harmons.  (Dkt. No. 110-2, Ex. A).  By Order entered on November 2, 2015, the claim of Specialized Environmental was expunged on Burt's Motion (Dkt. No. 65).  The claim of Adam Corporation, the only other creditor that is not a Settling Creditor, was expunged on the Debtor's Motion (Dkt. No. 106).  Thus, under the distribution scheme proposed in the Settlement Motion, no class is "skipped," and only the Harmons, as "insiders" of the Debtor, s*ee* 11 U.S.C. § 101 (31)(B),(C) and (D),  receive no payment.

### (iv)     The Debtor's Proposed Plans

On June 13, 2015, less than two months after filing the petition, and after LeClair filed its Motion to Dismiss, the Debtor filed a *Plan of Reorganization (Orderly Liquidation)* (the "Plan") (Dkt. No. 36, duplicated at Dkt. No. 37).   However, because the Debtor did not also file a proposed Disclosure Statement, the Debtor was unable to seek confirmation of the Plan at that time.  On August 11, 2015 (after the filing of LeClair's Dismissal Motion and Burt's Structured Dismissal Motion), the Debtor filed a *Disclosure Statement* and *First Amended Plan of Reorganization (Orderly Liquidation)* (the "DS" and the "Modified Plan") (Dkt. Nos. 101 and 100, respectively). By Order entered on August 21, 2015 (Dkt. No. 113), the Court denied the Debtor's application (to which the Settling Creditors had objected) to approve the DS on a preliminary basis and thereafter to hold a single hearing to consider the pending Dismissal Motions, approval of the DS and confirmation of the Modified Plan.  The hearing to approve the DS was adjourned pending

10

resolution of the Structured Dismissal and Settlement Motions, which were scheduled to be heard on September 9, 2015.

Debtor's proposed treatment of the Creditors changed from the Plan to the DS and Modified Plan as shown in the table below. If no dollar amount appears in a column, then none was provided in Debtor's submissions:

| Creditor | Plan | DS/Mod Plan[6] |
|---|---|---|
| Admin | Paid in full on ED[7] (no detail in Plan) | All paid in full on ED. $193,350 estimated. |
| Clerk's Office | -- | $         0 |
| UST | Paid in full on ED | $    13,350 |
| IRS secured | -- | $    73,782 Paid in full before other secureds |
| Priority Tax | Paid in full on ED | Unclear[8] |
| Burt | $4,500,000 on ED (vs. claim of $6.5 million) | $7,043,000 on ED[9] Shared *pro rata* with Ittleson in full satisfaction of both claims |
| A.H. Realty | $175,000 on ED (vs. claim of $360,000) | $   156,722 on ED |
| Steve Kalebic Accardi & Mirda and LeClairRyan | $770,000  (vs. total claims of over $3.6 million) *pro rata* 35 days after ED | Steve Kalebic only (secured) $244,000; LeClair and Accardi treated separately as noted below. |
| Ittleson | $1,500,000 on ED (vs. claim of $8.2 million) | $7,043,000 on ED[9] Shared *pro rata* with Burt in full satisfaction of both claims |
| LeClairRyan | -- | $   667,600 on ED (vs. $901,000 claim) |
| Accardi & Mirda | -- | $   143,610 on ED (vs. $159,000 claim) |
| Burt deficiency | To be waived | None |
| Ittleson deficiency | To be waived | None |
| G.U.C. | *Pro rata* from remaining funds 35 days after ED | *Pro rata* from remaining funds 15 days after ED |

---

[6] There is a discrepancy between the DS and Modified Plan. The Administrative and Priority claim sections were not updated from the original Plan to the Modified Plan and do not reflect the updated treatment of the claims in the DS.

[7] "ED" is Effective Date, defined as fourteen days after entry of Confirmation Order (Dkt. 100, Modified Plan, Art. II., ¶ 2.1, p.4). Administrative Expense is to be paid in full on the Effective Date or as agreed between the parties.

[8] The DS (Dkt. 101) Art. III.B.2 at p.17 is obstructed; $82,520.35 reflected there is probably a general unsecured claim and not a priority unsecured claim.

[9] Corrected to $7,435,535 in Debtor's *Memorandum of Law in Opposition to Motions to Dismiss* (Dkt. No. 122, p. 15, ¶ a).

11

| Creditor | Plan | DS/Mod Plan[6] |
|---|---|---|
| City of Petersburg unsecured | $    25,000 on ED | -- |
| Judge Sciuto | $    34,000 on ED | $34,000 on ED |
| Equity | No distribution; equity interest to be extinguished | No distribution. |

The source of funds in the Plan was to be "Insurance proceeds and litigation recoveries" (Dkt. No. 36, Art. VI, ¶ 6.1).  The only source of funds in the Modified Plan is the insurance proceeds (Dkt. 100, Art. VI, ¶ 6.1), without any reference to any litigation recoveries.

During (and before) the final hearing on the Dismissal and Settlement Motions and in their papers, Burt and Ittleson advised the Court that they objected to their treatment under the Debtor's proposed Plans, would not consent to the use of their collateral to fund a Chapter 7 liquidation, and would not support any plan that provided for a distribution to the Harmons (Dkt. No. 152, 9/9/15 Hr'g Tr. 48:1-49:2; 219:8-18; 223:2-20).   The other Settling Creditors joined in this opposition.

This opposition is not surprising since it would require Burt and Ittleson (and the other creditors who had been granted priority liens and/or judgments) to take substantial discounts on their claims, waive deficiencies and allow the Harmons to share in the recovery.  Since the Settling Creditors were unequivocally opposed to the Debtor's Plans, the only way the Debtor and Harmons could succeed in confirming their Plans would be through costly and time-consuming litigation. As is set forth in detail below, this Court has determined that such litigation has little or no chance of success and would serve only to increase the cost for all parties involved, reduce the amount of the Arbitration Award that would be available to creditors and further extend -- for months or perhaps years -- the litigation and uncertainty that has already gone on for far too long.

## IV.   THE ITTLESON AND BURT CLAIMS

Because they are by far the largest creditors in this case, and their claims were vigorously disputed by the Debtor and the Harmons, the Court will describe the history of the Ittleson and Burt Claims, and the Debtor and the Harmons' objections to them.

### A.   The CIT/Ittleson Loan and Forbearance Agreement

### (i)   The Deed of Trust and Security Agreement

On or about August 31, 2007, Petersburg Regency, as Borrower, executed and delivered to CIT Lending Services Corporation ("CIT") a promissory note in the original principal amount of $5.5 million (the "CIT Note") (Dkt. No., 57, Declaration of Gary Eisenberg, Ex. C, the CIT Note) (the "Eisenberg Decl."). The CIT Note was secured by a Deed of Trust and Security Agreement made by Petersburg Regency on the same date and recorded on September 4, 2007 in the clerk's office of the City of Petersburg, Virginia (Dkt. No. 57, Eisenberg Decl., Ex A, Deed of Trust, ¶¶ 4-5).  The Deed of Trust secured the loan with the Debtor's real property and improvements, including general intangibles and the proceeds of the foregoing.  Under the Deed of Trust, "proceeds" includes the "proceeds from the sale, exchange, collection or *other disposition or conversion, whether voluntary or involuntary, of any of the Property into cash or other liquidated claims, including, without limitation, all awards, payments and proceeds, included thereon, and the right to receive the same, which may be made as the result of any casualty . . . and any injury* to or decrease in value of the Property (Dkt. No. 57, Eisenberg Decl., Ex. A, Deed of Trust, p.2) (emphasis supplied).

Debtor also executed a separate Security Agreement, which granted CIT a security interest in substantially all the Debtor's personal property (Dkt. No. 57, Eisenberg Decl., Ex. D, Security Agreement).  The Security Agreement included as collateral all:

> general intangibles, contract rights . . . and all other personal property of Debtor, all . . . substitutions therefor and replacements thereof, and all

13

proceeds and products of all the foregoing, *including, without limitation, insurance proceeds. . .*

(Dkt. No. 57, Eisenberg Decl., Ex. D, Security Agreement, Schedule 1) (emphasis supplied).

Both CIT and Ittleson filed UCC-1's with respect to their collateral, as described in more detail below.

Thus, the collateral for the CIT loan expressly extended to insurance proceeds in the event of a loss or casualty under both the Deed of Trust and Security Agreement. The CIT Loan was also secured by the guarantees of Robert Harmon and Marlene Harmon (Dkt. No. 57, Eisenberg Decl., Exs. G and H, Guaranties).

### (ii)    Assignment of the CIT Loan to Ittleson and the Forbearance Agreement

The CIT Loan was assigned to Ittleson by Assignment of Deed of Trust and Security Agreement dated November 30, 2010 and Allonge to Promissory Note, also dated November 30, 2010 (Dkt. No. 57, Eisenberg Decl., Exs. B and C). Approximately six months after Ittleson purchased the CIT Loan, the Debtor, Ittleson and the Harmons entered into a Forbearance Agreement dated May 23, 2011 (the "Forbearance Agreement") (Dkt. No. 57, Eisenberg Decl., Ex. F, Forbearance Agreement).

Pursuant to the Forbearance Agreement, the parties made or reaffirmed the following agreements (among others):

- The Debtor acknowledged that the Loan was in default and that the amount due thereunder as of March 1, 2011 was $5,979,912.35, consisting of: (i) principal in the amount of $5,411,808.10; (ii) interest of $533,574.65; (iii) late fees of $34,529.60, plus attorneys' fees and expenses. *Id.* at pp. 1-2.

- The Debtor acknowledged that Ittleson "has a perfected first priority lien on the proceeds from the [Insurance] Litigation." *Id.* at p.2.

- The Debtor acknowledged that all terms of the Loan Documents remain in full force and effect, except as modified by the Forbearance

14

Agreement, with all such terms ratified, confirmed and reaffirmed. *Id.* at § 15. The Guarantees were also ratified and reaffirmed. *Id.* at § 19.

- Petersburg Regency and the Harmons (collectively, the "Debtors") confirmed that "there are no claims, offsets or counterclaims of any kind or nature" in favor of any of the Debtors with respect to the Loan Documents or "that would reduce" the acknowledged amount due on the Loan. *Id*. at §§ 2.1, 5.12, 5.17 and 29.

- Ittleson agreed to forbear from taking action to collect the Loan during the "Forbearance Period," which was defined as the period from the date of the Forbearance Agreement to December 31, 2011, on certain terms and conditions, including (without limitation) the following:

  i. Commencing on June 15, 2011 and on the 15th day of each month thereafter, Borrower was to pay $10,000 per month to Ittleson;

  ii. On or before the 5th day of each month, the Borrower would pay into an escrow account, one twelfth of the annual property taxes on the Property and otherwise pay all taxes on the Property;

  iii. Borrower assigned the first $2 million of the "Net Proceeds" of the Insurance Litigation proceeds (after reasonable attorneys' fees and expenses); and

  iv. Borrower would not create or incur any liens or indebtedness with respect to the Property and otherwise comply with the terms of the Loan Documents, except as provided in the Forbearance Agreement.

(Dkt. No. 57, Eisenberg Decl., Ex. F, §§ 2, 3 and 6.2).

In sum, if the Borrower complied with section 2.3 *and* the Loan was not otherwise in default, *and* Ittleson received $2 million on or before December 31, 2011, then the Loan would be deemed paid in full (Dkt. No. Eisenberg Decl., Ex. F, § 2.4(b)). At the Borrower's request, the December 31, 2011 deadline for the Forbearance Period and for the $2 million reduced payment was twice extended in writing by Ittleson. The first extension was to March 31, 2012 and the second was to September 30, 2012 (Dkt. No. 125, Certification of Robert T. Harmon dated August 31, 2015, Ex. 6 at final four pages to (the "8/31/15 Harmon Cert.")

Although the Debtor and the Harmons contend that the deadlines in sections 2.2 and 2.4(b) were further extended by the conduct or inaction of Ittleson, it is undisputed that there is no other writing signed by Ittleson that further extended the already extended September 30, 2012 deadline. Nor is there any dispute that the Borrower failed to pay the $2 million by that deadline. In this regard, the Forbearance Agreement provides that its terms "can be changed, waived, discharged or terminated" only in a writing signed by the party to be charged and that "[t]ime is of the essence" with respect to its provisions (Dkt. No. 57, Eisenberg Decl., Ex. F, Forbearance Agreement, §§ 27 and 32, respectively).

    **(iii)**    **The Defenses of the Debtor and the Harmons to the Ittleson Claim**

        **a.**    **The Alleged Defects in Ittleson's Security Interest and Amount Due Calculation**

Initially, the Debtor claimed at various times during this proceeding that Ittleson's security interest in the Arbitration Award was invalid because the UCC-1 filed by CIT had lapsed. Additionally, the Debtor claims that the interest charged by Ittleson under the Loan Documents was incorrectly calculated (Adv. Dkt. No. 1, Adversary Complaint, Count Ten) (the "Compl.") and Dkt. No. 75-1, Harmon Certification filed in July, 2015, ¶¶ 10-16) (the "July, 2015 Harmon Cert.")

As to the claimed lapse, the Debtor asserted that the original CIT UCC-1 expired on or about August 31, 2012 (five years after its assumed filing), but acknowledged that Ittleson filed its own UCC-1 on May 15, 2013 (Adv. Dkt. No. 1, Compl., ¶ 65 and Ex. H). As a result of the temporary lapse, the Debtor claimed that the UCC-1 financing statement filed on behalf of Mr. Burt "achieved a superior lien upon the Insurance Proceeds" (Adv. Dkt. No. 1, Compl., ¶¶ 65-66). The Debtor does not dispute, however, that Ittleson caused a subsequent UCC-1 to be filed with respect to the Debtor's personalty on May 15, 2013.

As to the interest rate calculation, the Debtor alleges that Ittleson charged an interest rate of approximately twenty-two percent or more, rather than the rate called for under the Loan Documents. In response, Ittleson presented the Declaration of Julie Tumia (Dkt. 83-1, the "Tumia Decl.," dated July 21, 2015) and the testimony of Dennis Davis, which set forth in detail the bases on which Ittleson calculated the amount due and the interest rate charged pursuant to the Loan Documents.[10]

During the hearing on the Settlement and Structured Dismissal Motions, the Debtor appeared to abandon its invalid security interest and improper amount due calculation claims, as it presented no evidence on either claim. Further, the Debtor did not directly address Ittleson's additional argument that its security interest in the Arbitration Award was perfected by the Deed of Trust. Nonetheless, the Court will address those claims in the legal section of this Opinion.

### b.  <u>The Alleged Extension of the Forbearance Agreement Deadline</u>

Debtor argues that the September 30, 2012 Forbearance Agreement deadline was further extended for an indefinite period based on the failure of Ittleson to terminate the Forbearance Agreement in writing and the substantial expenditure of time, effort and money by the Harmons after that deadline passed without any written notice of default or termination by Ittleson. The Harmons claim that Ittleson breached its duty of good faith and fair dealing in refusing to further extend or acknowledge the alleged extension of the Forbearance Agreement, that there was an implied extension and that, in any event, Ittleson should be equitably estopped from denying the extension and is barred from doing so by laches, as Harmon would not have continued to pursue the Insurance Litigation (or would have no incentive to do so) if the Ittleson Loan payoff was not discounted to $2 million.

---

[10] By the Tumia Decl., Ittleson amended and reduced its proof claim from $8,229,977.58 to $8,210,174.82 (Dkt No. 83-1, Tumia Decl., ¶¶ 1-2). Ms. Tumia is a representative of Servicios PQP, Inc., and Mr. Davis is an employee of Garrison Investment Group, which service the Loan for Ittleson. (Dkt. No. 83-1, ¶1; 9/9/15 Hr'g Tr. 180:23-181:24).

### c.  **Ittleson's Response**

Ittleson disputes these contentions and argues that the Forbearance Agreement was not terminated, but rather remains in full force and effect.  It is Ittleson's position that no notice of the expiration of the September 30, 2012 deadline was required, as that term was self-executing and did not require or result in termination of the Forbearance Agreement.  Ittleson further argues that the Borrower breached its obligations under the Forbearance Agreement in various material ways, including the following:

- failing to make the required $10,000 monthly payments under the Forbearance Agreement, commencing in July 2012;

- failing to pay the real estate taxes on the Property, during the terms of the Forbearance Agreement;

- losing the Property itself as the result of a tax foreclosure (after Ittleson had advanced over $250,000 to pay those taxes); and

- granting or permitting other first liens on the insurance proceeds, thereby failing to "irrevocably and unconditionally assign to Lender" the first $2 million of Net Proceeds from the Insurance Litigation.

None of these factual contentions is disputed by the Debtors or the Harmons.  Instead, the Debtors and Harmons argue that the extension continued until the Insurance Litigation concluded (which might have been years later and, in fact, did not occur until more than two years later), and that Ittleson effectively or implicitly agreed to waive: (i) the Debtor's failure to make the required $10,000 monthly payments; (ii) the Debtor's failure to pay real estate taxes; (iii) the Debtor's loss of the Property itself to Tax Foreclosure; (iv) the competing lien claims to the Insurance Proceeds; and (v)  the Debtor's failure to make the $2 million payment by the extended September 30, 2012 deadline.

18

## B.  **The Burt Loans and Advances**

### (i)  **The Original Note**

On or about July 10, 2009, the Debtor and Mr. Harmon, as Borrowers, and Mr. Burt, as

Lender, entered into a Promissory Note agreement pursuant to which Mr. Burt agreed to lend to

the Debtor and Mr. Harmon the sum of $750,000 (the "Note") (Dkt. No. 112, Burt Certification in

Support of Proof of Claim, Exhibit B) ("Burt Cert.").  The Note was for a five-month term, payable

with interest at the rate of 9.6% and entitled Mr. Burt to a "Lawsuit Recovery Participation," in

the amount of $250,000, payable from the "first" proceeds of the Insurance Litigation (Dkt. No.

112, Burt Cert., ¶¶ 1-4).  The security for the Note included a second mortgage on the Property

and:

> A Pledge of all Borrower's right, title and interest to the recovery of any
> proceeds in a certain action entitled "Petersburg Regency, LLC v.
> Selective Insurance Company," Docket No.: BER- L-12179-04, New
> Jersey Superior Court, Law Division-Bergen County which, pursuant to
> Court Order is the subject of binding Arbitration being decided by the
> Honorable Anthony J. Sciuto, J.S.C. (retired). *Id.* at ¶ 5.

By the Note, both the Debtor and Mr. Harmon agreed to "take no action which would cause

any lien and/or encumbrance on the collateral security described above without the express written

consent of [Mr. Burt]" (Dkt. No. 112, Burt Cert., ¶ 5(b)).  The Note contained other standard

clauses by which the Borrower agreed to pay any attorneys' fees and expenses incurred in

collecting the amounts due thereunder and a "savings" clause, which provided that in the event the

interest rate exceeded the amount allowed by law, the maximum legal rate of interest would be

charged with any excess interest credited to principal.  In connection with the Note, and the various

amendments described below, Mr. Burt filed a UCC-1 financing statement with the New Jersey

Department of Treasury on June 8, 2011 (Dkt. No. 112, Burt Cert., Ex. G, UCC-1).  The UCC

refers to Mr. Burt's collateral as including:  "Any and all proceeds to be recovered by Debtor

19

Petersburg Regency L.L.C. arising out of the matter captioned *Petersburg Regency, L.L.C. v. Selective Way Insurance Company, et als* (Docket No. BER-L-12179-04)." *Id.*

(ii)    **The Various Note Amendments**

1.  The First Amendment.  The Note was amended several times in writing.  The First Amendment was dated January 2010 and provided for, among other things, an additional $750,000 in advances by Mr. Burt to the Debtor and Mr. Harmon (bringing the total to $1.5 million), an extension of the maturity date to December 31, 2010, and the payment in full of, among other things, a purported prior lien on the Lawsuit, based on a $200,000 Note from the Debtor to Kirti Desai (Dkt. No. 112, Burt Cert., Ex. B, pp. 9 of 62 to 11 of 62).   Additionally, the interest component of the Note was eliminated, with the acknowledgement that the interest due under the Original Note was paid in full, and the Lawsuit Recovery Participation was increased to $750,000, plus twice any additional amounts loaned under the First Amendment.  *Id.*

2.  The Second and Third Amendments.  The same parties entered into Second and Third Amendments to the Note.  By the Third Amendment, the Loan amount was increased by an additional $1 million to a total of $2.5 million, the term was extended to the "date by which a final nonappealable decision is rendered in the Lawsuit," and the Lawsuit Recovery Participation was increased to $2.5 million, i.e., a doubling of the advances to date (Dkt. No. 112, Burt, Cert., Ex. E, Third Amendment).[11]  The Third Amendment, dated January 14, 2011, confirmed the elimination of the interest component of the Note, that all interest due under the Original Note was paid in full, and, like the First Amendment, provided that all other terms of the Original Note, as amended, remain in full force and effect.

---

[11] A copy of the Second Amendment was not provided by any party, but no party raised any issue or dispute as to its terms.

20

3.  <u>The Fourth Amendment</u>.  The Fourth Amendment to the Original Note was also made as of January 14, 2011, but was not actually executed by the parties until March 7, 2011, according to the acknowledgements on the Fourth Amendment (Dkt. No. 112, Burt Cert., Ex. F, Fourth Amendment). The Fourth Amendment adds a new party as Borrower:  Packaging Systems, L.L.C., which was owned and/or controlled by Mr. Harmon (Dkt. No. 75-1, July, 2015 Harmon Cert., ¶ 3).  As indicated in its recitals, the Fourth Amendment was entered into pursuant to the parties' prior undertaking to execute further instruments "to provide for the repayment of the Terms and Conditions of their transaction."

In the parties' papers and at the hearing, there was testimony and other evidence indicating that the additional $1 million provided by Mr. Burt under the Third and Fourth Amendments was utilized by Packaging Systems (at least in substantial part) to repay a high interest rate loan that was having a significant adverse effect on that business (9/9/15 Hr'g Tr. 69:6-13, 86:5-12, 95:21-97:5).  The Fourth Amendment also reaffirmed the Borrowers' unconditional assignment of, and grant of a security interest in, the Lawsuit Proceeds to Mr. Burt in the amount of $5 million (twice the $2.5 million advanced to date), and that there have been no other assignments or transfers of any interest in the lawsuit proceeds, other than to attorneys who represented the Borrowers in pursuing the claim (Dkt. No. 112, Burt Cert., Ex. F, ¶¶ 3, 6 and 9).

In the Fourth Amendment, the Borrowers also confirmed and/or agreed that:

(i)     Mr. Burt's right to receive full payment of the amount due to him - - $5 million at this time - - is "*prior and senior to Borrower's right to receive any portion of the proceeds.*"  *Id*. at ¶ 3 (emphasis supplied).

(ii)    If the proceeds of the Lawsuit were not sufficient to pay Mr. Burt $5 million, then Borrowers were obligated to pay the balance without interest.  If there was no recovery on the Lawsuit, the Borrowers were obligated to pay Mr. Burt $2.5 million without interest.  *Id*. at ¶¶ 3 and 4.

(iii)   The amount due to Mr. Burt is to be withheld from the proceeds of the Lawsuit and paid immediately upon collection, "without set off or reduction

of any kind."  Further, "*Borrower[s] will not receive any Proceeds of the Claim until Lender has been paid in full*."  *Id.*  at ¶ 15 (emphasis supplied).

(iv)    Borrower[s] "waive[ ] any defense to payment of the sums due and *promise[ ] not to seek to avoid the payment of any money due to Lender under this Agreement*."  *Id.* at 16 (emphasis supplied).

(v)    Borrower[s] acknowledge that other less expensive sources of funding may be available on more favorable terms, that they have had the opportunity to consult with their own attorney and other financial advisors regarding the Agreement, that it has been fully explained to them, and that all questions they may have were fully explained.  *Id.* at 22-23.

(vi)    Again confirmed that the Note accrues no interest and that all interest that was due under the Original Note was paid in full.  *Id.* at ¶ 2.

4.  <u>The Fifth and Sixth Amendments</u>.  The Fifth and Sixth Amendments to the Promissory Note, dated as of May 23, 2011 and May 11, 2012, respectively, were signed by the Borrowers; however, neither amendment was signed by Mr. Burt.  Mr. Burt's Certification includes only the Sixth Amendment (which is not signed by Mr. Burt) (Dkt. No. 112, Burt Cert., Ex. F, pp. 35 of 62 to 42 of 62), while Mr. Harmon's August 31, 2015 Certification attaches copies of both the Fifth and Sixth Amendments, but neither of those is signed by Mr. Burt (Dkt. No. 125, 8/31/15 Harmon Cert., Exs. 6(a) and 10(a)).[12]

The Fifth Amendment would have provided for the subordination of Mr. Burt's lien and security interest on the Insurance Proceeds to the then discounted $2 million payoff amount agreed to by Ittleson pursuant to the Forbearance Agreement.  In exchange for the requested subordination, Mr. Burt would be entitled to an additional $1 million from the Lawsuit Proceeds, or a total of $6 million (Dkt. No. 125, Harmon Cert., Ex. 10(a), ¶¶ 1-2).

---

[12] Mr. Harmon noted that the version of the Sixth Amendment he signed does not reflect the language crossed out by Mr. Burt at ¶ 5.  However, since that Amendment was not signed by Mr. Burt (as was acknowledged by Mr. Harmon) and was later referenced and partially incorporated into the Comprehensive Reaffirmation Agreement and Supplemental Agreement that was signed by all parties, and neither of those latter two Agreements included the stricken language, the fact that the Sixth Amendment was produced with (and without) the striking of that language is not relevant to this decision, as the Court finds that the latter agreements govern.  *Cf.* Ex 10(a) and (b) to Harmon Cert.

As noted, Mr. Burt did not sign the Fifth Amendment.  During his testimony at the hearing, stated emphatically that he never agreed to the subordination provision contained in that amendment, and that he similarly did not agree to accept the additional $1 million participation. (9/9/15 Hr'g Tr. 75:16-80:1, especially 79:6-20; 154:23-157:15).  During his testimony, Mr. Harmon did not refute Mr. Burt directly or indirectly on these points.

The Sixth Amendment makes no reference to the subordination, other than referring to the prior amendments, including the Fifth, and reaffirming the prior amendments, but only to the extent described below.  The Sixth Amendment provided: (i)  that certain additional discretionary advances may be made by Mr. Burt, with the same two-to-one payment on any additional advances if the Loan was paid in full by December 31, 2012; (ii) for an additional $500,000 payment to Burt if he was paid after December 31, 2012, irrespective of any other amounts actually loaned by Mr. Burt; and (iii) that if there was no recovery in the Insurance Litigation, Borrowers were obligated to pay Mr. Burt $2.5 million, plus any additional advances after the Sixth Amendment (Dkt. No. 112, Burt Cert., Ex. F, pp. 36-37 of 62, ¶ 6).

As noted above, Mr. Burt did not sign the Sixth Amendment.  He did, however, cross out and initial the following interlineated language [in brackets] from paragraph five:

a.   Lender has now agreed to lend Borrower additional funds [to be used solely utilized for attorneys fees in conjunction with the Litigation and for the payments required to be made by Borrower under a Forbearance Agreement with Ittleson Trust].  The Lender retains the absolute right, in its sole and absolute discretion, to determine the amount of any additional loan proceeds hereunder.  Nothing herein shall obligate Lender to make any specific loan amount or in any way assume Borrower's Litigation expenses or Ittleson Forbearance Agreement obligations.

(Dkt. No. 112, Burt Cert., Ex. F, p.36 of 62, ¶ 5).

In his testimony, Mr. Burt asserted that, consistent with his deletion of the stricken language above and the remainder of the paragraph, he was not committing to fund any particular

23

amount or agreeing to fund any of the Borrower's obligations under the Ittleson Forbearance

Agreement (9/9/15 Hr'g Tr. 163:2-165:5).  In his testimony, Mr. Harmon acknowledged that the

language of the Sixth Amendment did not obligate Mr. Burt to make any advances generally or

to Ittleson under the Forbearance Agreement specifically.  Nonetheless, Mr. Harmon testified

that Mr. Burt agreed to fund the $10,000 payments to Ittleson under the Forbearance Agreement:

> Q.    Okay.  So the answer to the question [whether the Sixth Amendment
> obligated Burt to make the $10,000 payments to Ittleson] is it's not in
> here, but he agreed to it.
>
> A.    Yes.

(Dkt. No. 153, 9/10/15 Hr'g Tr. 88:9-11).   Mr. Harmon also testified about an email that

confirmed Mr. Burt's obligation to fund the $10,000 payments to Ittleson, but no such email was

produced, even after being asked to do so by Burt's counsel.  9/10/15 Hr'g Tr. 88:22-91:1.

Finally, in the Sixth Amendment (like the Fifth Amendment), the Borrowers agreed to:

> waive, release and relinquish any claim of any kind or nature whatsoever,
> against the Lender, arising from this transaction.  It is understood that this
> is a complete and unequivocal release by the Borrowers of the Lender of
> any liability, or claim of liability of any kind or nature whatsoever.

In this connection, Marlene Harmon, Mr. Harmon's wife, agreed to (i) "waive, release and

relinquish any and all claim[s] of any kind or nature whatsoever" relating to the Litigation and  (ii)

"take no position in any court of competent jurisdiction inconsistent with the Agreements in the

attached Fourth [sic; should be Sixth] Amendment to Promissory Note." *Id.* (after signature page).

5. <u>Comprehensive Reaffirmation Agreement</u>.  Subsequently, the parties entered

into a Comprehensive Reaffirmation with Modifications of Agreements by and among James Burt,

the Debtor, Robert Harmon and Marlene Harmon, made as of February 1, 2013 (the

"Comprehensive Reaffirmation Agreement") (Dkt. No. 112, Burt Cert., Ex. F, p.43 of 62 through

p.52 of 62).  The Comprehensive Reaffirmation Agreement made specific reference to the

execution of the Fifth and Sixth Amendments by Borrowers (including Mrs. Harmon) and the fact that neither Amendment was executed by Mr. Burt.

In the Comprehensive Reaffirmation Agreement, the Borrowers (including Petersburg Regency, Packaging Systems and the Harmons) reaffirmed that the Fifth and Sixth Amendments are binding on them, but not on Mr. Burt, except to the extent included in the Comprehensive Reaffirmation Agreement. Thus, for example, the proposed subordination and funding obligations are not included with the parties' agreement. To the contrary, the Comprehensive Reaffirmation Agreement provides that: "[n]othing herein shall obligate [Burt] to make any specific amount or in any way assume Petersburg Regency's Litigation expenses or any other obligation." Nor does it provide for any subordination of Mr. Burt's interest.

Further, Borrowers again acknowledge that: (i) the Litigation Proceeds have not been otherwise "pledged or hypothecated or assigned" to any third party and that the Debtor has the right to those proceeds; (ii) increased the amount due to Mr. Burt to $7 million as the result of an additional $250,000 in advances made or to be made by Mr. Burt to fund the Insurance Litigation; and (iii) provided for the deposit of any Lawsuit Proceeds with Mr. Burt's attorney, as escrow agent, with the direction to disburse $7 million of those proceeds directly and immediately to Mr. Burt (Dkt. No. 112, Burt Cert., Ex. F, pp. 44 of 62 through 46 of 62, ¶¶ 1, 3, 4 and 5).

Significantly, in paragraph 6 of the Comprehensive Reaffirmation Agreement, the parties agreed that the advances by Mr. Burt were now "without recourse" and that any recovery by Mr. Burt is solely dependent upon recovery in the Insurance Litigation. Apparently, for purposes of clarity, paragraph 6 goes on to specifically state (and repeat) that if the Litigation is not successful, Mr. Burt shall have "no recourse" or any right to recover the Loan advances from Borrowers (Dkt. No. 112, Burt Cert., Ex. F, p.46 of 62, ¶ 6).

25

Finally, in paragraph 9, after the parties again acknowledge that they each have been represented by counsel and are agreeing to its terms fully and voluntarily, Borrowers[13] agreed to:

> waive, release and relinquish any claim of any kind or nature whatsoever against James Burt arising from this transaction. *[Borrowers] agree[] to interpose no defense of any kind or nature whatsoever to disbursement and repayment of these monies in any Court of competent jurisdiction. . . .* It is understood and acknowledged by *[Borrowers] that this is a complete and unequivocal release of James Burt made after consultation with Counsel to [Borrowers] of any liability or claim of liability of any kind or nature whatsoever arising out of this or any other transaction.*

(Dkt. No. 112, Burt Cert., Ex. F, p.47 of 62, ¶ 9) (emphasis supplied).

6. <u>Supplemental Agreement</u>. On September 27, 2013, the Borrowers entered into a Supplemental Agreement By and Among James Burt, Petersburg Regency, L.L.C., Robert Harmon, individually and Marlene Harmon, Individually (the "Supplemental Agreement") (Dkt. No. 112, Burt Cert., Ex F, Supplemental Agreement, p.53 of 62 through p.60 of 62). The Supplemental Agreement, which was signed by all parties, acknowledged the prior agreements, including the Comprehensive Reaffirmation Agreement, and the advance of additional funds by Mr. Burt. Mr. Burt's share of any recovery is increased to $8.4 million, with the entitlement to an additional $2 million if the Lawsuit Recovery was equal to or greater than $20 million (Dkt. No. 112, Burt Cert., Ex. F, p.55 of 62, ¶ 2). By the Supplemental Agreement, the escrow is modified in certain respects, with $8.4 million (or greater amount, if applicable) of the proceeds now to be forwarded to Mr. Burt's attorney for disbursement to Mr. Burt (Dkt. No. 112, Burt Cert., Ex F, p.56 of 62, ¶¶ 3-4).

The Supplemental Agreement contains the same or substantially similar language as quoted above in the Supplemental Reaffirmation Agreement (and other agreements) regarding: (i)

---

[13] The Comprehensive Reaffirmation Agreement refers to Petersburg Regency (rather than Borrowers) in its body, but defines Petersburg Regency as "collectively and specifically" referring to "Packaging Systems L.L.C., Robert Harmon, Individually and Marlene Harmon, Individually," as well as Petersburg Regency. *Id.* at ¶ 11.

Borrowers' agreement that the Lawsuit Proceeds belong to the Debtor and have not been otherwise pledged or assigned; (ii) Borrower's agreement to completely and unequivocally waive and release any claims against Mr. Burt; (iii) Borrowers' agreement not to interpose any defense of any kind to disbursement of the Lawsuit Proceeds to Mr. Burt in any Court; and (iv) reaffirmation of the prior Agreements, as provided in the Supplemental Agreement.

      (iii)      **The Debtor's Arguments Against the Burt Claim.** The Debtor argues that the amount due to Mr. Burt is voidable in its entirety as being usurious and that the amount due is only $513,396, far less than the $6,530,792 amount claimed by Burt (Adv. Dkt. No. 1, Compl., Counts Seven (challenge to extent and validity of liens of Burt and Ittleson, among others); Eight (equitable subordination of the liens of Burt and Ittleson and others); Nine (damages against Burt, Ittleson and others); Ten (usury against Burt); Eleven (Fraudulent Transfer/Lack of Consideration against Burt)). *Cf.* Burt Proof of Claim (15-1, ¶¶ 1-18).

      C.  **Other Secured Claims and Liens.**

      In addition to the secured claims of Ittleson and Burt, which total over $14.7 million, the Debtor granted or allowed the following liens to attach (or potentially attach) to the Lawsuit Proceeds and/or the Property:

|   | **Lien Creditor** | **Claim Type** | **Asserted or Allowed Annual Due** | **Cumulative Total** |
|---|---|---|---|---|
| 1. | R. Oshinsky & Co.[14] | Equitable Lien, Insurance Adjuster | $    948,063.00 | $    948,063.00 |
| 2. | Law Offices of Steve M. Kalebic[15] | Attorneys Lien | 2,577,199.00 | 3,525,262.00 |
| 3. | Accardi & Mirda, P.C.[15] | Attorneys Lien | 159,566.68 | 3,684,828.68 |

---

[14] The Debtor objected to this claim as being treated as secured.  By Order entered on September 16, 2015 (Dkt. No. 144), that objection was overruled by this Court on the basis of *In re Alston*, 322 B.R 265 (Bankr. D.N.J. 2005).

[15] Proof of claim not objected to by Debtor or other party; therefore, deemed allowed.  11 U.S.C. § 502(a).

| | Lien Creditor | Claim Type | Asserted or Allowed Annual Due | Cumulative Total |
|---|---|---|---|---|
| 4. | LeClairRyan[16] | Attorneys Lien | 920,306.46 | 4,605,135.14 |
| 5. | Department of the Treasury [15] | Tax Lien, perfected 10/1/12 | 73,782.92 | 4,678,918.06 |
| 6. | ThyssenKrupp Elevator[17] | Consent Judgment dated 1/8/13 | 52,540.55 | 4,731,458.61 |
| 8. | AH Realty Assoc.[17] | Court Order dated 11/13/13 | 360,000.00 | 5,091,458.61 |
| 9. | Ramada Worldwide, Inc.[17] | Judgment dated 10/1/12 and recorded as a lien | 1,192,886.80 | 6,284,642.41 |
| | | | TOTAL | $  6,284,345.41 |

(Dkt. No. 110-1, Motion to Approve Settlement of Settling Creditors, Ex. A, Settlement Agreement, Ex 1, "Agreed Distribution").

Additionally, as noted, Mr. Burt asserted a secured claim of at least $6,530,792, while Ittleson asserted a secured claim of at least $8,210,174.82, with both indicating additional fees and expenses were accruing. With these two secured claims alone totaling over $14.7 million and the allowed and/or undisputed secured claims referred to above totaling more than an additional $6.2 million, there is no question that the secured claims granted or suffered by the Debtor far exceeded the amount of the Arbitration Award; i.e., $10,230,626.64. In fact, by themselves, the Burt and Ittleson claims are more than $4 million in excess of the Arbitration Award. Thus, and as was stated by the Debtor in the Involuntary Case, this Court agrees that under any scenario, the secured claims against the Debtor far exceed the Debtor's only asset -- the Arbitration Award -- with the

---

[16] See footnote 3 above.

[17] The Debtor objected to secured status of claim. This Court reserved ruling on these objections pending resolution of the Motions to Dismiss and for a Structured Dismissal. Because the undisputed or deemed allowed claims of secured creditors far exceed the Lawsuit Proceeds, resolution of these objections is not required and is, in any event, mooted by the Court's resolution of the Structured Dismissal and Settlement Motions, as provided herein.

result that there would be no encumbered funds available for distribution to unsecured creditors in this bankruptcy case.

## V. STATEMENT OF THE LAW

### A. <u>Structured Dismissals</u>

By the Structured Dismissal and Settlement Motions, Burt seeks to distribute the $10,230,626 Arbitration Award among the fourteen (14) Settling Creditors, including the secured and priority tax claims of the IRS, and several unsecured claims. Additionally, at the September 9, 2015 hearing, the Settling Creditors amended the Settlement to include a $150,000 allowance for allowed administrative expenses. The Settling Creditors unanimously support the Structured Dismissal and Settlement Motions and also unanimously oppose the Debtor's Plan.

The Debtor and the Harmons object to the Settlement and dismissal outside a confirmed liquidating plan, arguing that the Creditors' proposal violates the distribution scheme under 11 U.S.C. § 1129(a) and (b) and that the Settlement is unfair and inequitable as to the Harmons. The Settling Creditors disagree, asserting that the structured dismissal is authorized by the Third Circuit's recent holding in *In re Jevic*, 787 F.3d 173, 176-77, 180-85 (3d Cir. 2015), and that this case represents an even better one than *Jevic* for a structured dismissal because all non-insider creditors are included and there is no class-skipping.

In *Jevic*, the Third Circuit affirmed a settlement, distribution and structured dismissal in a Chapter 11 case in which two undersecured creditors who were owed far in excess of their collateral ($53 million versus $1.7 million) agreed with the Creditors Committee and Debtor to provide a relatively small distribution to administrative and general unsecured creditors from the secured creditors' collateral and to the dismissal of the Bankruptcy Case. The Third Circuit approved the settlement and dismissal, even though the proposal failed to make any payment on a substantial priority claim to employees under the WARN Act (*i.e.*, the alleged class-skipping).

29

The "skipped" creditors argued that the distribution would have violated the priority scheme under 11 U.S.C. § 1129(a) and (b) had the proposal been part of a Plan and that the Bankruptcy Court did not have authority to order a structured dismissal in those circumstances.

In *Jevic,* the bankruptcy court had found that neither confirmation nor conversion to Chapter 7 were viable options because:  (i) there was no realistic prospect of a meaningful distribution to anyone other than the substantially undersecured creditors in the absence of the settlement; (ii) there was no prospect of a confirmable plan of reorganization or liquidation; and (iii) conversion to Chapter 7 was not a viable alternative because the two undersecured creditors would not agree to allow their collateral to be used to fund a Chapter 7 liquidation.  *In re Jevic*, 787 F.3d at 178, 181-82.

In affirming, the Third Circuit upheld the settlement and confirmed the Bankruptcy Court's authority to order a structured dismissal, albeit in "rare circumstances." The Third Circuit agreed with the Bankruptcy Court that the structured dismissal was "the least bad alternative" because there was "no prospect" of a plan being confirmed and conversion to Chapter 7 would have resulted in the secured creditors taking their collateral "in short order."  *In re Jevic*, 787 F.3d at 185.

As Burt observed in his reply memorandum with respect to the Settlement Motion, the instant case is stronger than *Jevic* because all creditors, except the Harmons, are receiving a distribution and the "class-skipping" issue which figured in *Jevic* is not present here.  As insiders, and parties to the agreements with Burt and Ittleson, the Harmons are in a different status than other creditors, with their claims subject to subordination and/or recharacterization as equity.  *See, e.g.,* 11 U.S.C. §510(c), and *In re Submicron Sys. Corp.*, 432 F.3d 448, 455-56 (3d Cir. 2006) (recognizing the equitable authority of the Bankruptcy Court under 11 U.S.C. § 105(a) to recharacterize debt as equity).  Also, the Harmons would be the last to receive a distribution on their equity interest.  *See* 11 U.S.C. § 1129(b)(2).  In *Jevic*, a *priority* class did not receive any

distribution and the structured dismissal was nonetheless approved.  Here, only the Harmons, who are at best unsecured and whose claims are likely to be in a subordinated status, are not receiving a distribution from the overencumbered Arbitration Award.

The ruling of the First Circuit in *In re SPM Mfg. Corp.,* 984 F.2d 1305 (1st Cir. 1993), also provides support for the Structured Dismissal here. In *SPM*, the bank held a perfected first priority lien in all of SPM's assets except certain real estate.  Within six months of the filing, the creditors' committee determined that reorganization was not a feasible alternative and that liquidation would leave nothing for unsecured creditors because the bank's secured claim exceeded the value of its collateral.  *Id.* at 1307-08.

Shortly after making this determination -- and within seven months of the Debtor's filing -- the committee and the bank entered into an agreement by which general unsecured creditors and the bank would share in the proceeds of the liquidation of the Debtor's assets, but to the exclusion of the IRS (which would have a priority claim) and the Debtor's insiders.  *Id*. at 1308.  The bankruptcy court approved the agreement and the related dismissal of the case, even though it was opposed by the Debtor and its insiders and the IRS priority claims and the insiders were "skipped." The First Circuit affirmed, upholding the "gifting" arrangement by which an undersecured creditor (the bank) agreed to share the proceeds of its collateral with general unsecured creditors, to the exclusion of the IRS and the insiders.  *Id*. at 1309, 1316.

In this Court's view, this case does, in fact, present a better one for a structured dismissal than either *Jevic* or *SPM*, as no classes are being skipped and the long and tortured history of this case and its predecessor litigation provides an even stronger basis for approving the Settlement *now*, before many more months or years of continuing and expensive litigation.  Like *Jevic* and *SPM*, in this case, the secured claims far exceed the value of the remaining collateral, there is no possibility for a distribution to unsecured creditors without a settlement, and no realistic possibility

of a reorganization or conversion to Chapter 7, which the Settling Creditors have unanimously opposed. The determination of the Settling Creditors with secured claims agree to share their collateral with other creditors (besides the Harmons) is their right and is not, under *Jevic* and *SPM,* a basis to disapprove the Structured Dismissal.

The Court also notes that there is no requirement in *Jevic* or *SPM* that the bankruptcy case be "mature" before a structured dismissal can be ordered, as was argued by the Debtor and the U.S. Trustee. To the contrary, the structured dismissal in *Jevic* was ultimately approved based on the Court's finding that there was no longer any real bankruptcy purpose for the case as no reorganization was possible, nor was there any other traditional route out of bankruptcy. *In re Jevic*, 787 F.3d at 181-82, 185-86. In *SPM,* the structured dismissal was agreed to when the case was seven months old. *In re SPM*, 984 F.2d at 1308. Thus, the length of time the bankruptcy case is in existence is not a determinative (or critical) factor in the *Jevic* or *SPM* analysis.

Another reason that this case presents an even stronger case for dismissal than *Jevic* or *SPM* is the fact that there is no possibility of a reorganization or other legitimate bankruptcy purpose present to this case, as was admitted by the Debtor in opposing the Virginia Insolvency Case (Dkt. No. 26-2, McGill Cert., Ex. F, pp. 13, 15-16) (Involuntary Case was "futile" and served no legitimate bankruptcy purpose, particularly because the secured claims exceeded the Arbitration Award).

The Debtor's position in the Virginia Insolvency Case and the Settling Creditors' position here -- that there is no legitimate purpose to this bankruptcy case -- is also amply supported by the case law in this Circuit. "A party filing for Chapter 11 bankruptcy may prove that its petition served a valid bankruptcy purpose by showing that the petition "preserv[ed] a going concern or maximize[ed] the value of the debtor's estate." *In re 15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d. 605, 619 (3d Cir. 2009), quoting *Integrated Telecom Express, Inc.,* 384 F.3d 108, 120 (3d

Cir.), *reh'g den. and reh'g en banc den.*, 389 F.3d (3d Cir. 2004), *cert. den.*, 545 U.S. 1110 (2005).

In this case, the Debtor has admitted that it is not a going concern. It has no assets other than the

Arbitration Award, has not engaged in any business since 2011, and lost the Property itself in 2014

to tax foreclosure. Even its charter has been revoked by New Jersey (Dkt. No. 26-1, McGill Appl.,

¶ 6 and Dkt. No. 26-2, McGill Cert., Ex. H).

       All that the Debtor seeks to do here in opposing the Structured Dismissal and Settlement

is to redistribute the Arbitration Award -- which is fixed and overencumbered -- so that its

principals get a distribution in contravention of the agreement entered among all the Debtor's other

creditors and the Debtor's own agreements with Burt and Ittleson. That is not a legitimate

bankruptcy purpose. The Debtor cannot use bankruptcy solely as a "litigation tactic" or to

"orchestrate pending litigation." *In re SGL Carbon Corp.*, 200 F.3d 154, 163, 165 (3d Cir. 1999)

(internal citations omitted). *See also and compare In re Integrated Telecom Express, Inc.*, 384

F.3d at 118 (nonoperating Debtor which filed Chapter 11 petition solely to cap landlord's lease

rejection damages was not filed in good faith; mere redistribution of assets is not a valid bankruptcy

purpose); *In re SGL Carbon Corp.*, *supra*, 200 F.3d at 162, 165 (financially healthy Debtor who

anticipated large adverse antitrust judgments which were still remote did not have a "valid

reorganizational purpose").

    **B.  Judicial Estoppel Precludes the Debtor from Arguing that this Case Serves a Valid
       Bankruptcy Purpose**

       The doctrine of judicial estoppel "prevent[s] a litigant from asserting a position inconsistent

with one that she has previously asserted in the same or in a previous proceeding in separate

proceedings to the benefit of the litigant in each proceeding." *See, e.g., In re Oneida Motor

Freight, Inc.*, 848 F.2d 414, 415, 418 (3d Cir.), *cert. den.*, 488 U.S. 967 (1988) (because the debtor

failed to schedule or otherwise disclose a claim against a secured creditor during the bankruptcy

case, debtor was judicially and equitably estopped from later asserting a contract and tort action

against that creditor).  The doctrine prevents a litigant from playing "fast and loose" with the

courts.  *Scarano v. Central R.R. Co. of N.J.*, 203 F.2d 510, 513 (3d Cir. 1953) (internal citations

omitted) (an employee who recovered a substantial disability settlement on the basis that he had

suffered long-term incapacitation from work was not permitted one month later to sue for

reinstatement to his job on the theory that he was fully rehabilitated).   Judicial estoppel

"'prohibit[s] parties from deliberately changing positions according to the exigencies of the

moment.'"  *New Hampshire v. Maine*, 532 U.S. 742, 750, *reh'g den.*, 533 U.S. 968 (2001) (*quoting*

*U.S. v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993), *cert. den.*, 511 U.S. 1042 (1994).

The Supreme Court in *New Hampshire* cited three factors which "typically inform" the

decision to apply judicial estoppel:

(1) whether the party's second position was "clearly inconsistent with its earlier position";

(2) whether "the party . . . succeeded in persuading the court to accept party's earlier position" so that later acceptance of the contrary position creates the impression that "either the first or the second court was misled"; and

(3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*New Hampshire*, 532 U.S. at 750-51 (some internal citations omitted) (in a dispute about fishing

rights with the State of Maine, the State of New Hampshire was judicially estopped from asserting

a different boundary in the instant litigation than it had in certain 1970s litigation, as New

Hampshire had benefited from its earlier position.  *Id.* at 755).

Under the *New Hampshire* and *Oneida* analysis, this Debtor has taken inconsistent -- if not

directly contradictory -- positions in the bankruptcy courts of Eastern District of Virginia and

District of New Jersey regarding the merits of its bankruptcy case.  As to the first element, Debtor

filed this Chapter 11 case in the District of New Jersey on April 20, 2015 and asserts that the case

should not be dismissed, despite having argued in the Eastern District of Virginia on February 25,

2015 that the involuntary bankruptcy was "futile" because the secured claims were far in excess

34

of the Arbitration Award and that, as a result, there would be no distribution to general unsecured

creditors in a Chapter 7 or 11 case.  As to the second element, the Debtor succeeded in persuading

the bankruptcy court in the Eastern District of Virginia to dismiss the involuntary petition on

March 18, 2015 pursuant to a Consent Order that included a settlement agreement with the

Petitioning Creditors.

The remaining issue is whether the Debtor "would derive an unfair advantage or impose

an unfair detriment" on the opposing creditors if allowed to maintain its inconsistent position in

this Court and prevent the settlement and dismissal of the bankruptcy case.  If the case remains

alive, the Debtor seeks to proceed with its liquidating plan by prosecuting its application to approve

its Disclosure Statement and the Plan it describes and the Adversary Proceeding (Dkt. No. 101,

pp. 17-19.  The Debtor's proposed Plan and Disclosure Statement (in the various iterations)

provide for a dividend to general unsecured creditors, including the Harmons, by reducing the

distributions to Burt, Ittleson and other secured creditors over their objections.  Because *none* of

the Settling Creditors -- who now constitute *all* the remaining secured and unsecured claims

against the Debtors (except for the Harmons) -- support the Debtor's Plan, the only way to reduce

those claims is through litigation.  In other words, the Debtor would have to prosecute the already

vigorously opposed Plan and Adversary Proceeding commenced by the Debtor that seeks to avoid,

in whole or in part, the liens of Burt, Ittleson and others, notwithstanding the many problems with

those claims, as described in this Opinion.

The prosecution and resolution of that Adversary Proceeding and Plan would undoubtedly

and significantly increase the costs of litigation to all parties and delay the resolution of this case

for months, if not years, while the amount of the Arbitration Award would remain the same.  Only

the amount of the recovery of the secured and unsecured creditors would continue to be reduced

as administrative and other expenses increased.  Thus, using this bankruptcy case to avoid and/or

35

reduce or eliminate the liens of its secured creditors, in direct contradiction of the position the

Debtor took in the Virginia Involuntary, would allow the Debtor to obtain an unfair advantage and

work to the extreme detriment of the Debtor's secured (and unsecured) creditors, who have been

waiting many years for a payment.

Accordingly, this Court holds that judicial estoppel applies to bar the Debtor and the

Harmons from asserting inconsistent and, indeed, contradictory positions in this Court as to the

*bona fides* of its bankruptcy case and the claims of the Debtor's secured creditors.  To hold

otherwise would be unfair, inequitable and serve only to delay and increase the expense of

litigation that has gone on far too long and cost far too much.  That is particularly true where, as

here, the *only* parties that would potentially benefit are the Debtor's insiders, Mr. and Mrs.

Harmon, and the lawyers and other professionals who would continue to accrue all substantial fees

and expenses while this bankruptcy case and the contested adversary proceeding and Plan

proposed by the Debtor made their way through the trial and appellate courts.

**B.  Approval of the Settlement under the Martin factors**

    **(i)**       **The General Standards**

Federal Rule of Bankruptcy Procedure 9019 provides that "[o]n motion by the trustee and

after notice and a hearing, the court may approve a compromise or settlement" of a bankruptcy

case.  FED. R. BANKR. P. 9019(a).   Settlements are favored in bankruptcy as they "minimize

litigation and expedite the administration of the bankruptcy estate." *In re Martin*, 91 F.3d 389, 393

(3d Cir. 1996); *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006).

The decision to approve the settlement "lies within the sound discretion of the Bankruptcy

Court."  *In re Still*, 444 B.R. 520, 523 (Bankr. E.D. Pa. 2010).  A bankruptcy court must determine

whether a settlement is "fair and equitable" and in the "best interests of the estate." *In re TCI 2

Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010).  The Court must "assess and balance the

36

value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *In re Martin*, 91 F.3d at 393.  The Third Circuit "recognize[s] four criteria that a bankruptcy court should consider in striking this balance":

> (1) the probability of success in the litigation;
> (2) the likely difficulties in collection;
> (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
> (4) the paramount interest of the creditors.

*In re Martin*, 91 F.3d at 393 (quoted, paragraphing added).  The Court should not conduct a "mini-trial" on the merits but "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983), *cert. den.*, 464 U.S. 822 (1983) (internal quotations omitted).

### (ii)   <u>Standing</u>

Prior to analyzing the *Martin* factors, the Court will address the standing issue raised by the Debtor, i.e., that the Settling Creditors do not have standing to bring the Settlement Motion under Bankruptcy Rule 9019.  In this regard, during an earlier proceeding, this Court determined that it would grant the Settling Creditors derivative standing (to the extent required), but that it would analyze the Settlement under the standards established by our courts in deciding whether to approve a settlement under Bankruptcy Rule 9019 in any event.  *See* Second Scheduling Order (Dkt. No. 95) at ¶ 1; *In re Martin*, *supra*.

While this Court does not believe it is necessary to determine that there is derivative standing to approve the Settlement in this case as part of  the Structured Dismissal, there is authority for such derivative standing on behalf of a creditors committee (which is at least analogous to the Settling Creditors here) under Rule 9019 and 11 U.S.C. § 105.  *See In re TSIC, Inc.,* 393 B.R. 71, 78 (Bankr. D. Del. 2008) ("The Court is therefore satisfied that the Committee has the right pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 105(a) to request

37

the Court's approval of the Settlement"). *See also In re Smart World Tech.*, 423 F. 3d 166 (2d Cir. 2005), where Justice Sotomayor (then in the Second Circuit) left open the possibility of derivative standing for a creditor to seek approval of a settlement that would preclude a debtor from preserving a claim. *Id.* at 176-77. The Settling Creditors here, who represent all the Debtor's creditors except for the insiders, Mr. and Mrs. Harmon, are in many ways a more appropriate and representative constituency than a committee consisting of only some creditors.

Whether derivative standing is available or not, this Court believes it is appropriate to analyze the Settlement under the Rule 9019/*Martin* standards. This Court has already determined that it has the authority to approve the Structured Dismissal with conditions, i.e., the terms of the Settlement Agreement, under *Jevic* and § 349(b) of the Bankruptcy Code. Section 349 describes the effect of a dismissal order, "unless the court . . . orders otherwise." This language has been construed as providing the bankruptcy court with authority to order a structured dismissal. *See Jevic,* 787 F.3d at 181; *see also In re Naartjie Custom Kids, Inc.*, 534 B.R. 416, 423 (Bankr. D. Utah 2015) (approving Settlement Agreement supported by debtor and creditors' committee and holding that "unless the court orders otherwise" language makes clear that bankruptcy court can alter the effect of dismissal and authorize a structured dismissal on specified terms). Nonetheless, under *Jevic* and cases such as *SPM*, this Court finds that a settlement in the context of a structured dismissal should also be separately analyzed and approved under the Rule 9019/*Martin* standards, as discussed below.

    **(iii)**   **Specific Application of the *Martin* Factors**

      **1.**   **Probability of success in the litigation**

The litigation contemplated as the alternative to the Creditors' Settlement consists of the Debtor's proposed adversary proceeding to avoid and/or reduce the liens and claims of the secured creditors, including Burt and Ittleson, and the Debtor's proposed Plan, both of which are sure to

be hotly contested and have already been opposed by Burt, Ittleson and other the Settling Creditors.

Since the claims of Burt and Ittleson by themselves far exceed the Arbitration Award, the Court

will analyze the efficacy of those claims and the Debtor's defenses to them. These issues were

addressed through extensive briefing, prehearing discovery and an evidentiary hearing that was

held before this Court over two full days.[18]

For the reasons that follow, the Court determines that: (i) the Debtor and the Harmons are

highly unlikely to succeed on their claims against Burt and Ittleson; and (ii) the cost, delay and

uncertainty associated with the sure to be hotly contested Adversary Proceeding and Plan proposed

by the Debtor would far outweigh the limited (if any) benefit that would be derived from the

continuing litigation of those claims. To the contrary, this Court finds that continuing litigation

would be likely only to decrease the recovery to Settling Creditors and increase substantially the

expense of all parties.

### (a) The Burt Claim

As was noted above, the Debtor and Mr. Harmon (and then Mrs. Harmon) repeatedly

reaffirmed the validity of Mr. Burt's claims and the priority of his lien and also agreed: (a) to

"waive, release and relinquish any claim of any kind or nature whatsoever" against Burt; (b) to

take no position inconsistent with those Agreements in any Court; (c) that Mr. Burt's claim is valid

and senior to other liens and is entitled to payment in full of this claim *prior to* any payment to the

Debtor from the Arbitration Award; and (d) to interpose no defense of any kind to disbursement

---

[18] The Court notes that at earlier stages of this case, the Debtor objected to the Structured Dismissal Motion
on the grounds that the proof of claims bar date had not passed and the Debtor had not been afforded due
process. However, the August 25, 2015 bar date passed before the hearing on the Settlement and Structured
Dismissal Motion on September 9 and 10, 2015. Thus, this objection is moot. Further, this Court entered
two Scheduling Orders that permitted limited but targeted discovery as to the extent and validity of the
creditors' claims and held two full days of hearings on the pending motions. Thus, the due process
objections are overruled.

of the Arbitration Award to Mr. Burt.  Those agreements were made with the advice of counsel and included give-and-take by both sides, including Mr. Burt's release of the Harmons from personal liability.  *See* discussion of terms of Original Note, amendments above in Statement of Facts.  Those agreements should be -- and will be -- enforced by this Court in approving the Settlement and Structured Dismissal.

By the adversary proceeding and the contested Plan, the Debtor and the Harmons seek to do all that they repeatedly agreed not to do.  They are asserting claims against Mr. Burt, including usury, that they agreed to "waive, release and relinquish."  They claim that Mr. Burt's lien is wholly or partially invalid and are seeking payment from the Arbitration Award (through a distribution from the Debtor) *before* Mr. Burt is paid in full.   They have interposed various defenses and claims with respect to Mr. Burt's entitlement to his share of the Arbitration Award and asserted that he is owed far less than his claim i.e., $513,396 instead of the $6,530,792 Mr. Burt has claimed -- or nothing at all.

In this regard, the $513,396 amount Mr. Harmon now claims Mr. Burt is owed by the Debtor is obviously far less than the amounts the Debtor and the Harmons agreed Mr. Burt was owed and the amount the Debtor said was owed to Mr. Burt -- $8.4 million -- in obtaining the dismissal of the Involuntary Case.[19]  Further, in the Plans submitted by the Debtor, the Debtor proposed to pay Burt between $3.5 million and $4.5 million.  (Dkt. No. 36, Plan docketed June 13, 2015, Art. V, ¶ 5.1, p.7; Dkt. No. 100, First Modified Plan, docketed Aug. 11, 2015, Art. V, ¶ 5.1, p.7).  And finally, during the hearing, Mr. Harmon acknowledged that Mr. Burt made the advances

---

[19] Mr. Harmon asserted under oath that only part of the advances from Mr. Burt, i.e., the $513,396, went directly to, and is therefore owed by, the Debtor (*see* 7/15/15 Harmon Cert., ¶¶ 4-9 and Ex. A). However, that claim is again directly contradicted by the Note and Amendments, under which the Debtor, the Harmons (and Packaging Systems, LLC) are all obligors and the amount owed was repeatedly reaffirmed and by Mr. Burt's testimony and certifications.

Mr. Burt said he made and is entitled to the money he advanced with "a profit." 9/10/15 Hr'g Tr. 98:11-16.  Thus, the Court determines that the Debtor and the Harmons are highly unlikely to succeed on the multiple challenges to Mr. Burt's lien and claim that they repeatedly reaffirmed or defenses and affirmative claims they repeatedly released.

As to the Debtor's usury claim, this too contradicts the agreements of the Debtor and the Harmons with Mr. Burt.  In the First, Second, Third and Fourth Amendments, the Debtor acknowledged that the interest component of Mr. Burt's advance had been eliminated and confirmed that his recovery was based on the "Lawsuit Recovery Participation," i.e., twice the amount advanced.  Thus, beginning with the First Amendment, there was no interest charged on the Note, as amended, and the Debtor's usury claim was released in any event.

Further, N.J.S.A. § 31:1-6 provides that a corporation or limited liability company may not assert a usury defense:

> No corporation, limited liability company or limited liability partnership shall plead or set up the defense of usury to any action brought against it to recover damages or enforce a remedy on any obligation executed by said corporation, limited liability company or limited partnership.

In this regard, it bears noting that this statute was amended in 1997 (effective January 19, 1998) to include limited liability companies (such as Petersburg Regency, L.L.C.) and limited liability partnerships. Corporate officers who guarantee a corporation's obligations are not permitted to raise the usury defense as to the guaranteed corporate obligation.  *See*, *e.g.*, *Nation Wide, Inc. v. Scullen*, 256 F. Supp. 929, 932-33 (D.N.J. 1966) *aff'd* 377 F.2d 554 (3d Cir. 1967); *Gelber v. Kugel's Tavern*, 10 N.J. 191, 196 (1952); *Selengut v Ferrara*, 203 N.J. Super. 249, 258-59 (App. Div.), *cert. den.*, 102 N.J. 316 (1985).

Additionally, whether a loan is usurious is determined in substantial part by intent; i.e., whether the agreement was made with the intent to evade the usury laws.  *See*, *e.g.*, *Hoyt v.*

41

*Bridgewater Cooper Mining Co.*, 6 N.J. Eq. 253, 274 (Ch. Div. 1847) *aff'd* 6 N.J. Eq. 625 (E.&A. 1848). Here, the parties' intent was clearly set forth in their agreements, as amended. Burt was entitled to no interest and, ultimately, no recovery at all if the Lawsuit was unsuccessful. In the Court's view, this was not a loan but rather the purchase of a participation in the interest in the recovery from the Lawsuit; i.e., the Lawsuit Recovery Participation, as described in those agreements. Thus, the usury laws do not apply. Consistent with the foregoing, our District Court held in *Dopp v. Yari*, 927 F. Supp. 814 (D.N.J. 1996), that the criminal usury statute did not apply to a contract for the financing of litigation in exchange for the division of the litigation proceeds, especially given that collection was at complete risk and dependent on the outcome of the litigation. *Id*. at 823. The same holds true here.

Finally, if, for the sake of argument, the total amounts advanced by Mr. Burt are considered, the interest rate would not exceed the fifty-percent limit under the New Jersey criminal statute cited by the Debtor, N.J.S.A. § 2C:21-19, as demonstrated by the chart below (which includes *only* the first three advances totaling $2.5 million):

| Date | Advance Amount | Fifty Percent Interest | Total Due |
|------|----------------|------------------------|-----------|
| 7/09 | $     750,000.00 | $ 2,250,000.00 (for 6 years) | $  3,000,000.00 |
| 1/10 | 750,000.00 | 1,875,000.00 (for 5 years) | 2,625,000.00 |
| 1/11 | 1,000,000.00 | 2,000,000.00 (for 4 years) | 3,000,000.00 |
| TOTAL | $     2,500,00.00 | $     6,125,000.00 | $  8,625,000.00 |

Thus, even without considering the subsequent advances by Mr. Burt, the total amount Mr. Burt claims he is owed of $6,530,792 is approximately $2.1 million *less* than what the minimum usurious rate of fifty percent would yield, *without* compounding. Accordingly, the usury claim of the Debtor and the Harmons -- like their other claims against Mr. Burt -- is without merit on several grounds and extremely unlikely to succeed.

42

## (b) **The Ittleson Claim**

The Debtor and the Harmons also made various challenges to the validity and extent of the Ittleson claim.  In this respect, they asserted the Ittleson security interest had lapsed and was invalid.  Next, they claim that Ittleson overstated its claim by approximately $2 million. Additionally, the Debtor and the Harmons claim that Ittleson was obligated to accept $2 million from the Debtor under the Forbearance Agreement between the parties, notwithstanding the passing of the stated deadline for that payment on grounds of laches, equitable estoppel and breach of the duty of good faith and fair dealing.  The Court finds that these claims, which are addressed in order below, are also highly unlikely to succeed, and their prosecution would serve only to increase the expense, delay and uncertainty of continuing litigation.

## (1)  **The Alleged Invalidity of Ittleson's Security Interest**

As was noted above, the Debtor (and the Harmons) claim that the UCC-1 filing with respect to the original CIT security interest expired in August 2012 (five years after the original filing) and that therefore Ittleson's assigned security interest in the Arbitration Award was invalid. However, the Debtor and the Harmons also acknowledge that Ittleson filed a new UCC-1 on May 15, 2013 which was almost two years *before* the Debtor's bankruptcy filing (Adv. Dkt. No. 1, Compl., ¶ 61 and Ex. H).

The Ittleson Security Agreement expressly applies to all the Debtor's personalty, including general intangibles, contract rights and all proceeds and products of all of the foregoing," *including, without limitation, insurance proceeds*" (Dkt. No. 57, Eisenberg Decl.. Ex. D, Schedule 1) (emphasis supplied). The Debtor does not directly address or dispute the meaning of this clear language and instead argues that because of the lapse, Mr. Burt's prior perfected security interest was now ahead of Ittleson's security interest (Adv. Dkt. No. 1, Compl., ¶ 66).   However, even if that is the case, it does not mean that Ittleson's security interest is invalid.  To the contrary,

43

Debtor's argument is really that Ittleson's security interest is *valid*, but subordinate to Burt.  In other words, this argument acknowledges (at least indirectly) the validity of both security interests. In sum, the Debtor's lapsing argument is without merit because Ittleson's May 15, 2013 UCC-1 filing is in effect.  *See* N.J.S.A. § 12A:9-515(a) (UCC-1 financing statement generally effective for five years).

The Debtor (and the Harmons) also do not address the Ittleson Deed of Trust, which was properly recorded in Virginia and also expressly extends to the "proceeds" from the Property, "whether voluntary or involuntary, . . . including, without limitation, all awards, payments and proceeds, included thereon, and the right to receive same, which may be made as the result of any casualty . . . and any injury to or decrease in value of the Property" (Dkt. No. 57, Eisenberg Decl., Ex. A, Deed of Trust, p.2).  This Court determines that the security interest of Ittleson in the Arbitration Award is valid and perfected under both the Deed of Trust and the Security Agreement, with any challenge to that validity extremely unlikely to succeed.

### (2)  Amount Due Calculation

Mr. Harmon also takes issue with the amount due calculated by Ittleson (Dkt. No. 75-1, July 2015 Harmon Cert., ¶¶ 10-16 and Ex. D).  There, Mr. Harmon certifies that the interest rate charged by Ittleson during the limited period described in the various statements he refers to -- all beginning in 2015 and calculated to the date of the filing of the Ittleson proof of claim on June 12, 2015 -- ranges from 22.79% to 51.30%.  Mr. Harmon also indicates that the wrong interest rate was charged by Ittleson.

In response, Ittleson presented the Declaration of Julie Tumia (Dkt. No. 83-1) and the testimony of Dennis Davis.  Ms. Tumia's Declaration included a chart detailing how the interest on the Ittleson loan was calculated, including the rate charged, any changes to the rate, and the number of days at which interest accrued at that level.  Mr. Davis confirmed the accuracy of the

chart and calculations in his testimony.  In his testimony, Mr. Harmon did not address the Ittleson amount due calculation.

This Court adopts the Ittleson Amount Due Calculation and rejects the limited and misleading calculation offered by Mr. Harmon.  Mr. Harmon's calculation is limited and misleading because it is based on an extremely short time period -- less than six months -- and does not directly address the amount due calculation over the many years this loan was outstanding after being acquired by Ittleson.  Further, Mr. Harmon's calculations did not include the correct contract or default interest rate under the Note (Dkt. No. 57, Eisenberg, Decl., Ex. C, Note, pp. 1-2)  (post Construction Rate is applicable Swap Rate *plus* 3.25 %; default rate is contract rate *plus* four percent).  Mr. Harmon's Certification uses only the Swap Rate for contract interest and calculates no default interest (Dkt. No. 75-1, July, 2015 Harmon Cert., ¶ 16 and Ex. D).[20]

Additionally, the Debtor and the Harmons did not indicate precisely what they believed the correct amount due was, although Mr. Harmon's Certification appears to indicate a minimum amount due of $7.5 million, plus interest in 2015 (Dkt. No. 75-1, July, 2015 Harmon Cert., Ex. D). In any event, the Ittleson calculation was based on the admitted amount due as of the execution of the Forbearance Agreement, the interest and default interest rates provided for under the Note and the substantial real estate tax advance of $256,534 that had been inadvertently omitted from a prior calculation.  Thus, this Court determines that the Debtor's challenge to the amount due Ittleson is highly unlikely to succeed as well.

---

[20] Mr. Harmon's Certification indicates that the default interest rate under the Note is the five-year FRB Swap Rate of .81% plus 4%.  However, under the Ittleson Note, the base interest rate after the Construction or Multiple Disbursement Period is 3.25% plus the Swap Rate (Dkt. No. 83-1, Tumia Decl., Ex. B, pp. 1-2).

**(3)   The Asserted Extension of the $2 Million Discounted Payment**

As noted above, the Debtor and the Harmons contend that the Debtor's right to make a $2 million discounted payoff of the Ittleson loan extended through the end of the Insurance Litigation, notwithstanding the Debtor's continuing and substantial defaults under the Forbearance Agreement and the expiration of the deadline to exercise that right under the express terms of the Forbearance Agreement, as extended in writing by Ittleson.  The Debtor and the Harmons argue that this implied extension is justified by reasons of equitable estoppel, laches and/or the breach of the duty of good faith and fair dealing, asserting that Ittleson should be precluded from asserting the full amount due and must accept $2 million for its entire claim.  These arguments are likely to fail for various reasons.

First, the express terms of the Forbearance Agreement provided for the discounted payoff right: (i) only through December 31, 2011, which was twice extended in writing to September 30, 2012; (ii) only for so long as the Debtor satisfied the Forbearance Conditions, including the payment of $10,000 per month and all real estate taxes; and (iii) only if the Debtor was not otherwise in default under the Loan Documents.  Additionally, the Forbearance Agreement provides that it could be "changed, waived, discharged or terminated" only by a writing signed by the party to be charged.  *See* Forbearance Agreement, Ex. F to Eisenberg Decl., at § 27.

It is undisputed that the Forbearance Period under § 2.2 and the right to make the discounted payoff under 2.4(b) were twice extended in writing by Ittleson, with the last extension to September 30, 2012.  It is also undisputed that there were no other written extensions.  Nor is there any dispute that the Debtor:  (i) failed to make the required $10,000 payments during the Forbearance Period by failing to make the July 2012 payment (or any payment thereafter); (ii) failed to pay the real estate taxes on the Property; (iii) lost the Property to tax foreclosure in 2014;

46

(iv) failed to irrevocably and unconditionally to assign the first $2 million of the Lawsuit Proceeds to Ittleson; and (v) failed to pay the $2 million to Ittleson by the extended deadline.

The Court determines that these failures constituted material breaches and defaults under the Forbearance Agreement and that the deadlines in the Forbearance Agreement were not further extended in writing.  As a result, it is highly unlikely that the Debtors will succeed on their argument that Ittleson was required to accept the discounted $2 million payoff after the written deadlines expired.

The Debtor and Mr. Harmon also improperly rely on § 27 of the Forbearance Agreement to argue that Ittleson was required to give written notice of the termination of the Forbearance Agreement and the Debtor's defaults thereunder.  In fact, in his testimony, Mr. Harmon cited to § 27 as requiring written notice of termination by memory, without even referring to the document. *See* 9/10/15 Tr. at 146:10-17 (noting that Forbearance Agreement requires that any modifications, amendments or termination must be in writing, as does the Ittleson Deed of Trust, the Guarantee and the Security Agreement and that he "read every single one of these documents").  Yet, at the same time, he also argued that other significant provisions of the Forbearance Agreement were effectively waived, without any writing, including the deadline to make the reduced payoff and the obligation to pay real estate taxes.  In other words, when Mr. Harmon believed (incorrectly) that the writing requirement was helpful to his arguments (e.g., written notice of termination of Forbearance Period is required), it applied.  In contrast, when the writing requirement was counter to his position (e.g., as necessary for an extension of the payoff deadline), the writing requirement does not apply.

Ittleson argues that the Forbearance Agreement was not terminated, remains in effect and that no written notice is therefore required.  This Court agrees with the Ittleson interpretation, as that is what the Agreement provides.  Many provisions of the Forbearance Agreement remain in

effect, such as the reaffirmation of the Loan Documents, the acknowledgement of amount due and that the Debtor and the Harmons have no defenses, set-offs or counterclaims against Ittleson (at least as of the date of that agreement).  Further, nothing in the Forbearance Agreement, including § 27, requires Ittleson to notify the Debtor and the Harmons that the Forbearance Period expired. That period expired in accordance with its terms, as was understood by Mr. Harmon, since he asked Ittleson to agree to the accrual of the monthly $10,000 payments and real estate taxes after the September 30, 2012 deadline, without any written notice from Ittleson to that effect (Dkt. No. 125, 8/31/15 Harmon Cert., Ex. 11, 10/4/12 email; and 9/10/15 Hr'g Tr. at 135:6-12) (referring to section 6 of Forbearance Agreement, Mr. Harmon testifies that his 10/4/12 email was four days after the alleged default).  *See also* 9/10/15 Hr'g Tr. 217:6-17.

Similarly, the Harmons' equitable estoppel, laches and breach of duty of good faith and fair dealing arguments are highly likely to fail (Dkt. No. 124).  First, the duty of good faith and fair dealing implicit in every New Jersey contract may not be used to make a better deal for a party that he or she negotiated.  *Glenfed Fin. Corp. v. Penick Corp.*, 276 N.J. Super. 163, 175 (App. Div. 1994).  Specifically, the duty cannot "alter the terms of the written agreement" or "preclude a creditor from exercising its bargained-for rights under the loan agreement."  *Id.* at 175 (internal citations omitted).

In *Penick,* the Appellate Division determined that a creditor's "temporary forbearance in exercising its remedies" after the borrower defaulted "did not preclude the creditor from subsequently exercising those rights" and did not constitute a breach of the covenant of good faith and fair dealing.  *Id.* at 177-78.  *Accord Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 92 (3d Cir. 2000) (the implied covenant of good faith and fair dealing, "[i]f construed too broadly . . . could become an all-embracing statement of the parties' obligations under contract law, imposing unintended obligations upon parties and destroying the mutual benefits created by

48

legally binding agreements"); *see also Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 288 (3d Cir. 2000); *Cargill Global Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 580 (D.N.J. 2010) ("[W]here the terms of the parties' contract are clear, the implied covenant of good faith and fair dealing will not override the contract's express language") (internal citations omitted).

Making a better contract for themselves is precisely what the Debtor and the Harmons are attempting to do here, by arguing for an open-ended extension of the written deadline of the Forbearance Agreement, even though the Debtor was in breach of virtually every material term of that Agreement.[21]  The Court finds that, as a practical and legal matter, this argument is very likely to fail.

Second, equitable estoppel and laches have no applicability in this case.  Equitable estoppel requires a representation of fact upon which the counterparty had a right to rely and did rely to his detriment.  *Wheeling-Pittsburgh Steel Corp. v. McCune*, 836 F.2d 153, 162-63 (3d Cir. 1987); *In re REF Indus., Inc.* 283 F.3d 159, 164 (3d Cir. 2002).  It precludes a party from asserting rights against a counterparty who has relied on the party's conduct to the counterparty's detriment and has "change[d] his position for the worse."  *W.V. Pangborne & Co., Inc. v. N.J.D.O.T.*, 116 N.J. 543, 553 (1989) (internal citation omitted).  Here, there is no alleged representation by Ittleson that the payoff deadline was extended.  Instead, the alleged extension is based on Ittleson's action or inaction.  Further, there is no credible evidence that Mr. Harmon relied on any alleged extension in continuing to pursue the Litigation.  To the contrary, as noted above, and as he testified, Mr. Harmon requested that the Forbearance Agreement be modified, but did not get any response.  In

---

[21] Additionally, a party in material breach of an agreement has no right to insist that it be performed.  *Nolan v. Lee Ho*, 120 N.J. 465, 472 (1990); *Magnet Resources, Inc. v. Summit MRI, Inc.*, 318 N.J. Super. 275, 285 (App. Div. 1998).

this Court's view, he continued to pursue the Litigation without the extension for his own hoped-for benefit.

As Mr. Burt testified, Mr. Harmon told him that he was going to win $30 million in the Litigation -- testimony which was not disputed by Mr. Harmon (9/9/15 Hr'g Tr. 94:10-19; 128:4-9; 156: 3-10 and 9/10/15 Hr'g Tr. 57:19-22). Consistent with this apparent expectation, the Supplemental Agreement provided for an additional, more limited split of the proceeds (ten percent) to Mr. Burt if the Lawsuit Proceeds were equal to or greater than $20 million (Dkt. No. 112, Burt Cert., Ex. F, Supp. Agreement, p. 55 of 62, ¶ 2).

Finally, the testimony and other evidence indicates that the Debtor and Mr. Harmon had no ability to continue to fund the Litigation, as evidenced by the substantial and continuing borrowings from Mr. Burt, the inability to make even the $10,000 forbearance payments to Ittleson, the failure to pay real estate taxes, the eventual loss of the Property because of that failure and the failure to pay a long list of other creditors. In fact, Mr. Harmon admitted as such in connection with his request for an additional extension and additional time to make the Forbearance payments (Dkt. No. 125, 8/31/15 Harmon 8/31/15 Cert., Ex. 9, 1/9/12 email ("I am totally out of money"); and Ex. 11, 10/4/12 email ("I am out of money and basically living on Social Security"), and Ex. 11, 7/14/14 email ("the only chance I have of making any money is by making deals" because insurance proceeds are basically committed to lawyers, expert witnesses and creditors).

Laches, a more specific defense which prohibits an "inexcusable delay in instituting suit" when the defendant is prejudiced by the delay, is even less applicable here. *Univ. of Pittsburgh*, 686 F.2d 1040, 1044 (3d Cir.), *cert. den.*, 459 U.S. 1087 (1982); *Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1108 (3d Cir. 1996). There was no delay by Ittleson in enforcing its rights and pursuing the Arbitration Award once it was made in late 2014.

Nor, in this Court's view, was Mr. Harmon prejudiced, for the reasons stated above. Also, laches generally does not apply when the statute of limitations has not run, as is undeniably the case here. *Petrella v. Metro-Goldwyn Mayer,* ___ U.S. ___, 134 S. Ct. 1962, 1973-74 (2014); *Fox v. Millman,* 210 N.J. 401, 417-24 (2012).

In sum, this Court determines that Mr. Harmon was continuing to pursue the Litigation for *his* potential benefit, at the expense -- either mostly or entirely -- of others. Accordingly, there is no basis for the application of equitable doctrines of equitable estoppel or laches here. To the contrary, in this Court's view, it would be extremely inequitable and unfair to allow the Debtor and Mr. Harmon to have an open-ended right to a substantially discounted payoff in the face of continuing and substantial defaults by the Debtor, and also retain the substantial benefits Debtor and the Harmons (who were guarantors of the Ittleson Loan) hoped to obtain from continuing the Litigation with the funding -- direct or indirect -- of others.

For all these reasons, the Court also finds it at least highly unlikely that the Debtor and the Harmons would succeed in their claims against Ittleson. Conversely, the Court finds that (as was noted previously) continued litigation is likely, if not certain, to increase the expense, delay and uncertainty that will be faced by Ittleson, Burt and the other Settling Creditors if the Debtor and the Harmons are permitted to proceed with these types of claims.

## 2.  Likely Difficulties in Collection

The Arbitration Award with which the Settling Creditors expect to fund the Settlement is stable now and creates no difficulty in collection. The litigation which the Debtor seeks to pursue creates uncertainty in collection by: (1) consuming the Arbitration Award to fund the litigation; and (2) depriving legitimate creditors of the estate of those ready proceeds while the contested plan and Adversary Proceeding are litigated. In other words, the amount of the Arbitration Award

available for distribution will continue to decrease if this case is litigated, rather than settled, with no potential to increase the amount of the Arbitration Award.

### 3. Complexity of the Litigation Involved, and the Expense, Inconvenience and Delay Necessarily Attending It

As set forth above, the difficult and hotly contested litigation proposed by the Debtor is unlikely to succeed on the merits, with the only consequence that Debtor shall have dissipated the Arbitration Award to fund the litigation and reduced the amount which the Creditors can collect now as a result of the settlement.

### 4. Paramount Interest of Creditors

The paramount interest of creditors, secured, priority and unsecured, is fully met and best served by the Settlement agreed to among them, for all the reasons described above. Additionally, to the extent the Debtor was ever able to succeed in its Adversary Proceeding and Plan, and the Harmons were ever able to overcome the objections to their receipt of any portion of the Arbitration Award (both of which this Court believes is highly unlikely for the reasons stated), both Ramada, as the holder of a judgment in the amount of $1,164,867.94 against Mr. Harmon, individually, and Ittleson, as the holder of guarantees from Mr. and Mrs. Harmon, have indicated that they would seek to attach any such recovery to the Harmons.  *See* Docket No. 107 (Ramada letter) and Docket No. 131, ¶ 63 (Ittleson response).  Thus, the Harmons would not be likely to benefit from the continuing litigation, but other legitimate claimants -- *i.e.*, the Settling Creditors -- would be further harmed by the expense, delay and uncertainty of more contested litigation that would drag on for months or years.

Additionally, as insiders, the Harmons' vote would not be counted towards acceptance of any proposed plans pursuant to 11 U.S.C. § 1129(a)(10), and their claims would be subject to various challenges as equity or otherwise grounds justifying subordination or recharacterization of their claims.  *See, e.g.,* 11 U.S.C. § 510(c) and *In re Submicron Sys. Corp.*, 432 F.3d at 545-56.

Finally, the Debtor's Plan is already opposed by every other creditor.  As a result, the Debtor's proposed Plan would fail to satisfy the requirements of confirmation and would be highly unlikely to result in any recovery to the Harmons in any event.

In sum, in this case, rather than representing the "least bad alternative" that was affirmed by the Third Circuit in *Jevic*, this Court finds that the Settlement represents the best available alternative in the difficult, extended and expensive circumstances that have brought the parties to this point.  Unlike *Jevic*, no class of creditors -- priority or otherwise -- is being "skipped" and there is unanimous support for the Settlement among the Debtor's non-insider creditors.  Only the Harmons, as insiders, oppose the Settlement and Structured Dismissal, as their interests are directly opposed to the non-insider creditors.  Thus, this Court finds and determines that the Settlement and Structured Dismissal is plainly in the best interests of the Debtor's creditors and the estate.

## VI.   EVIDENCE ISSUES -- Parol Evidence, Evidence of Settlement Discussions and Consideration for CIT Loan Sale Excluded

In their briefs and during the hearings on these motions, the Debtor and/or the Harmons sought to introduce evidence of: (i) internal communications at Ittleson and between Ittleson and Mr. Harmon regarding the Forbearance Agreement and the negotiations of its terms that predated the Forbearance Agreement's execution on or about May 23, 2011; (ii) settlement discussions between the parties; and (iii) the amount paid by Ittleson for the purchase of the Loan.  The Court excluded that evidence for the reasons described below.

### A.  Parol Evidence

The parol evidence rule generally bars consideration of verbal or written communications that occur prior to the effectiveness of an agreement that are sought to be introduced to vary, add to, or contradict the terms of that agreement.  *See generally* Russell*, Bankruptcy Evidence Manual* at ¶¶ 9.1 and 10.1 (2014-15 ed.) (citing cases and other authorities).  In applying the parol evidence rule, which is one of substantive contract law, as opposed to a rule of evidence, the bankruptcy

court is bound to apply the law of the state in which it sits. *Id.* at ¶ 9.1. Under New Jersey law, parol evidence is not admissible to vary, add to or contradict the terms of a valid written agreement that is unambiguous on its face (absent fraud or the like). *Conway v. 287 Corp. Ctr. Assocs.*, 187 N.J. 259, 268-70 (2006).

Here, the provisions of the Forbearance Agreement that set forth the terms on which the Debtor would have the right to the reduced $2 million payoff are not at all ambiguous, and no one has suggested otherwise (Dkt. No. 57, Eisenberg Decl., Ex. F, Forbearance Agreement, §§ 2.2, 2.3(a) and 2.4). Under those sections, provided that the Debtor satisfied the "Condition of Forbearance" and the Debtor was not otherwise in default, Ittleson agreed to forbear from exercising its remedies under the Loan Documents. *Id.* at §§ 2.2-2.4. Further, and most significantly, the original "Forbearance Period" (§ 2.2) and the Debtor's right to make the discounted payment (§ 2.4(b)) both expired on December 31, 2011. As was previously noted, those deadlines were twice extended in writing by Ittleson, with the final extension ending on September 30, 2012 (Dkt. No. 125, 8/31/15 Harmon Cert., Ex. 6).

Since these terms are not ambiguous, the parol evidence rule applies to bar this Court's consideration of pre-contract communications relating to the Forbearance Agreement by which the Debtor and the Harmons seek to vary, add to or contradict the express terms of that Agreement. In this regard, the Debtor and the Harmons asked the Court to consider those communications in support of their arguments that the deadlines described above were extended through an indefinite date, *i.e.*, the conclusion of the Insurance Litigation, notwithstanding the Debtor and the Harmons' failure to (among other things) make the installment and real estate tax payments required under the Forbearance Agreement and the ultimate loss of the Property to tax foreclosure. Those open-ended (and heavily one-sided) terms would certainly vary and/or contradict the express terms of the Forbearance Agreement and therefore were not considered by this Court.

54

Further supporting the Court's conclusion in this regard are the integration and no oral modification clauses of the Forbearance Agreement set forth in sections 14, 15 and 27. *See, e.g, In re Yates Dev., Inc.*, 256 F.3d 1285, 1289-90 (11th Cir.), *reh'g and reh'g en banc den.*, 275 F.3d 50 (11th Cir. 2001) (applying Florida law (which is similar to New Jersey's) and barring consideration of extrinsic evidence that would vary or contradict agreement's unambiguous language, particularly where agreement contained integration clause); *see also Conway*, 187 N.J. at 268 ("In general, the parol evidence rule prohibits the introduction of evidence that tends to alter an integrated written document"); *Halper v. Halper*, 164 F.3d 830, 840-41 (3d Cir. 1999); *U.S. v. Clementon Sewerage Auth.*, 365 F.2d 609, 613-14 (3d Cir. 1966).

## B.  Settlement/Mediation Discussions

Under FED. R. EVID. 408, neither an offer to compromise, acceptance (or nonacceptance) of such offer or an actual compromise is admissible to prove liability or invalidity of the claim or amount.  Russell, *Bankruptcy Evidence Manual*, § 408:1 (2014-15 ed.) at 470.  The reasons for this exclusion are: (1) irrelevance, since the offer is often made to avoid the expense, delay and inconvenience of litigation, and is not admission of liability; and (2) the strong public policy in favor of compromise.  *Id*.  The exclusion of such evidence and the policies behind are also recognized in our local Court Rules, which provide as follows:

> All proceedings or writings of the mediation conference . . . and any statement by any party, attorney or other participant, *shall in all respects be privileged and not reported, recorded, placed in evidence, communicated to the Court . . . or construed for any purpose as an admission against interest.* New Jersey Local Bankruptcy Rule 9019-2(d)(8) (emphasis supplied).

In fact, this case was referred to mediation before Judge Kaplan pursuant to this Local Rule, which provides a separate basis for exclusion of any evidence as to the parties' settlement discussions in connection with the mediation.  Nonetheless, the Debtor asked this Court to consider the offers made in those discussions before Judge Kaplan.  This Court finds such discussions to be

inadmissible under FED. R. EVID. 408 and Local Bankruptcy Rule cited above.  Those discussions are irrelevant to resolution of the issues before this Court, particularly when balanced against the unfair prejudice that would result from considering such evidence and the strong public policy in favor of settlements.  *See* FED. R. EVID. 402 and 403.

### C. **Amount Paid by Ittleson to Acquire Loan**

The Debtor and the Harmons also sought to introduce evidence of the amount Ittleson paid to CIT to acquire the Loan.  The Court excluded such evidence on grounds of relevance and prejudice.  *See, e.g., KS Fin. Grp., Inc. v. Stales & Little Mortg. Co.,* 68 F.3d 471, 1995 WL 581872 at *3 (5th Cir. 1995) (not for publication) (the amount of consideration creditor paid for a note is irrelevant as a matter of law; as a result, district court did not err in granting summary judgment before discovery as to the amount of consideration could be taken); *In re Talmo*, 192 B.R. 272, 275 (Bankr. S.D. Fla. 1996) (price at which creditor acquired judgment lien was irrelevant; creditor retained all rights of original lienholder).  The amount Ittleson paid for the Ittleson Loan is similarly irrelevant to the issues before this Court.  Ittleson has the right to enforce the terms of its Loan with the Debtor, without regard to the amount Ittleson paid to acquire the Loan.

### VII. **CONCLUSION**

For all these reasons, the Settlement and Structured Dismissal Motions are granted, the Settlement Agreement is approved and this bankruptcy case is dismissed, with prejudice.  A separate order accompanies this Opinion.

Dated: November 2, 2015                          /s/Vincent F. Papalia
                                                 VINCENT F. PAPALIA
                                                 United States Bankruptcy Judge